KUJAWA, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*April 17—May 8, 1908.*

*Railroads: Highway crossings: Signals: Statutes: Construction: Duty independent of statute: Evidence: Sufficiency: Duty to stop: Disregard of duty: Negligence: Proximate cause.*

1. While sec. 1809, Stats. (1898), requiring of a railroad company the blowing of the engine whistle eighty rods from a highway crossing, cannot be complied with where the engine starts within that distance, still the requirement that the engine bell be rung is applicable and entirely possible of fulfilment, at least from the point of starting until the highway is crossed.

2. Even in the absence of express statutory requirement it was the duty of railroad employees in charge of an engine to approach a highway crossing with due care, having regard to the physical surroundings and the obstructions to vision, if any, and if the circumstances called for the giving of signals for the safety of travelers approaching the crossing using due care, the omission to give such signals would be negligence.

3. In an action for injury to plaintiff's team caused by a railway-crossing collision, *held*, that there was evidence which would have justified the jury in finding that no signal was given by the railroad company and that such failure was negligent.

4. It cannot be held as matter of law that it is always the duty of one approaching a railway crossing to stop, even though he be driving a team. Whether it is his duty to stop as well as to look and listen is a question for the jury after due consideration of all the surrounding circumstances.
5. In an action for damages to plaintiff's team caused by a railway-crossing collision, it appeared that there was a clear view of the crossing for 140 feet, that the highway was sandy, that plaintiff's vehicle was a spring buggy which made very little noise; and there was no evidence of other noises or of any wind blowing. A verdict for defendant was directed on the ground that it was plaintiff's duty to stop, look, and listen before he came so near the crossing that he would be struck or that his horses would be frightened by an approaching train, and failure to observe this duty necessarily constituted negligence which was the proximate cause of the injury. *Held* error, as, under the circumstances, whether ordinary care required him to stop his team was a question for the jury.
6. Sec. 1809, Stats. (1898), requiring that the engine bell be rung before reaching and while passing over a highway crossing, is designed, not merely to prevent travelers who are about to use the crossing from running into the train, but also to enable them to know of the approach of the train at a sufficient distance to guard their horses against taking fright.
7. Where a switch engine approached a railway crossing without giving the signals required by statute, and a traveler driving toward such crossing looked and listened for signals but did not stop, the circumstances not being such as to make it negligence as a matter of law for him to approach without stopping, and by reason of the failure to give the signals he was led to approach nearer than he otherwise would have done, and to a point where the sight and noise of the coming train frightened his horses, causing them to become unmanageable so that they dashed against the train, the failure to give proper signals was the proximate cause of the collision.

APPEAL from a judgment of the circuit court for Marinette county: S. D. HASTINGS, Circuit Judge. *Reversed.*

This is an action to recover damages resulting from a crossing collision at the unincorporated village of Crivitz. The main line of the Superior division of the defendant's railway runs north and south along the east side of the vil-

lage.    The Menominee branch of defendant's railway joins
the main line at Crivitz.    As this branch approaches the
main line from the east it divides into a wye at a point sev-
eral hundred feet distant from the main line, one line run-
ning northwest and the other southwest until each connects
with the main line.    The railway station and hotel are situ-
ated in the extreme southerly angle of the triangle thus
formed.    A highway running east from the village crosses the
main track and several parallel side tracks at a point in the
northerly part of the triangle about 850 feet north of the sta-
tion platform.    This highway continues to run easterly and
crosses the northern branch of the wye at a point about 300
feet east of the track of the main line.    To the south of this
highway and in the triangle there is considerable growing
brush and some jack pine and other trees, so that if a traveler
crosses the main track and proceeds east on the said highway
his view to the south and southeast, including that part of
the north branch of the wye which is south of the highway, is
much obscured until he reaches a point about 140 feet from
and east of the crossing over the wye track, after which point
the vision is practically unobstructed.

It appears that at about 5 o'clock p. m. on June 29, 1906,
the plaintiff's son Peter, about sixteen years of age, started
from Crivitz to go to his home in the country east of the vil-
lage; that he was driving his father's double team hitched to
a buggy and that his mother was with him in the buggy,
and that the team was of ordinary gentleness.    Peter testified
that he started out on the highway in question; that as he
approached the first track and about 200 feet therefrom he
stopped and listened for a train but heard none, and then
drove slowly on over the main track and side tracks, after
which he drove on a slow trot towards the wye track; that he
was listening for a whistle or a bell but heard none, and when
he got past the bushes and trees he saw an engine rapidly
approaching the crossing from the southeast on the wye

track pushing a freight caboose and a flat car in front of. it, about 250 feet from the crossing; that his horses saw the engine at the same time and became frightened and began to jump and run; that he tried to hold them but could not, nor could he turn them off from the road; that they ran toward the crossing, where they were struck by the flat car and killed and he and his mother were thrown out; and that he would have stopped as soon as he had crossed the main track if he had heard the whistle or the bell.

The fact of the collision was not disputed. The engine with the cars in question had come from the main track up the southern branch of the wye up to and just upon the Menominee main line, stopped, and then proceeded on the north branch to the point of collision. No whistle had been blown, but it was claimed that the engine bell was rung continuously from the time the engine started on the north branch. The engine was run by the fireman alone, who was sitting in the engine cab on the northeast side. A brakeman threw the switch which let the train in upon the north branch of the wye, the engine then stopped, the switchman closed the switch, got upon the caboose, and gave the fireman a signal to go ahead. The fireman then started ahead. The brakeman walked through the caboose out onto the flat car, which was loaded with iron sewer pipe, and first saw the team when they were about twenty or twenty-five feet from the crossing, and then gave a signal to the fireman to stop the engine, but it was too late to stop before reaching the crossing, and the train was not stopped until it had passed the crossing nearly 100 feet. The distance from the point of the wye to the crossing was about 850 feet. The estimates of the speed of the train ranged from six or eight miles on the part of the defendant to twelve or fifteen miles on the part of the plaintiff. There was testimony tending to contradict Peter's claim that the horses were running and beyond control, as well as testimony tending to corroborate

his claim.   There were two or three bridge carpenters riding on the flat car who saw the impending collision and waved their arms and shouted to Peter, but gave no signal to the fireman.   There was some testimony that immediately after the collision Peter said that he stopped by the bushes and one of his horses got scared and started to run and his lines broke, but this was denied by Peter.

At the close of the evidence a verdict for the defendant was directed, and from judgment upon the verdict the plaintiff appeals.

*P. H. Martin,* of counsel, and *L. M. Evert,* attorney, for the appellant.

For the respondent there was a brief by *C. E. Vroman* and *P. A. Martineau,* attorneys, and *C. H. Van Alstine* and *H. J. Killilea,* of counsel, and oral argument by *Mr. Killilea.*

WINSLOW, C. J.   The highway crossing in question was not within a city or incorporated village, hence it was within the terms of that part of sec. 1809, Stats. (1898), which requires that the engine whistle shall be blown eighty rods from the crossing and the bell continuously rung from that point until the highway be crossed.   As the engine in the present case started from a point well within the eighty-rod limit, the requirement that the whistle be blown eighty rods from the crossing became impossible of fulfilment; but the requirement that the engine bell be rung, at least from the point of starting until the highway was crossed, was still applicable and entirely possible of fulfilment.   Furthermore, even in the absence of express statutory requirement it was the duty of the defendant to approach the crossing with due care, having regard to the physical surroundings and the obstructions to vision, if any, and if the circumstances called for the giving of signals in order to properly conserve the safety of travelers who were approaching the crossing in the exercise of ordinary care the omission of the defendant to

give such signals would be negligence.    *Eilert v. G. B. & M. R. Co.* 48 Wis. 606, 4 N. W. 769.

There was sufficient evidence from which the jury would have been justified in finding that no signal of any kind was given by the defendant's employees at any time during the approach of the engine from the time it started from the main track of the Menominee branch until it reached the crossing.   There was also ample proof that the view of the track was partially or wholly obscured by bushes and trees so that a traveler on the highway coming from the west could not well see an approaching engine or train until he reached a point 140 feet from the crossing and perhaps nearer.   So it must be held that there was sufficient proof to sustain a finding that defendant's employees were negligent in failing to give signals as the train approached the crossing, and the serious question in the case is whether the evidence would warrant a finding that such negligence, if found, was the proximate cause of the collision.   Of course, there must be proximate causal relation between the negligence and the collision in order that the plaintiff may recover.   The trial judge held that this causal relation could not be found, the reason being that it was the duty of the driver of the team to stop and look and listen before he got so near the crossing that he would be struck *or that his horses would be frightened* by the sight of an approaching engine.   In other words, that the driver must determine where the danger zone, within which his horses are in danger of being frightened, begins, and must at his peril stop before entering upon that zone, and that if he does not do so, but proceeds without such precautions and suffers injury by the frightening of his horses by a negligently operated train, he is necessarily guilty of negligence which is the proximate cause of his injury and is remediless.

We think this rule is entirely too strict and imposes too onerous a burden on the traveler.   While this court has con-

sistently held that it is the imperative duty of every traveler approaching a railway track to look and listen for a train, it has not held that it is always his duty as matter of law to stop, even though he be driving a team.  Generally the question whether he should stop or not will be a question for the jury after due consideration of all the surrounding circumstances.  *Duffy v. C. & N. W. R. Co.* 32 Wis. 269; *Eilert v. G. B. & M. R. Co.* 48 Wis. 606, 4 N. W. 769; *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216, 35 N. W. 278; *Abbot v. Dwinnell,* 74 Wis. 514, 524, 43 N. W. 496; *Duame v. C. & N. W. R. Co.* 72 Wis. 523, 40 N. W. 394.

True, there may be cases where the view of the·approaching traveler is so thoroughly obstructed and his hearing so cut off by the noise of his wagon or by other causes that it is evident that neither sight nor hearing will afford him any protection, and in such cases if there be no conflict in the evidence the court will be justified in holding as matter of law that he should stop and make investigation, especially if he knows that a train is due.  *Seefeld v. C., M. & St. P. R. Co., supra.*  Such cases, however, are exceptional, and we do not regard this as one of them.  The evidence shows that the obstructions to the vision ceased at a point about 140 feet from the crossing; that the road was a sandy road, and that the buggy was a spring buggy and made very little noise. There was no evidence of other noises nor that any wind was blowing, and the driver testified that he could have heard the engine bell had it been ringing.  Under the circumstances we think that the question whether ordinary care required him to stop his team was one for the jury.

The statutory requirement that the engine bell be rung before reaching and while passing over the crossing is designed, not merely to prevent travelers who are about to use the crossing from running into the train, but also to enable them to know of the approach of the train at a sufficient distance to guard their horses against taking fright.  2 Thomp. Com. on Neg. § 1926; *Norton v. Eastern R. Co.* 113 Mass.

366.   This court in *Ransom v. C., St. P., M. & O. R. Co.*
62 Wis. 178, 22 N. W. 147, held that one who was traveling
upon a highway parallel with the railroad track and near a
crossing was also entitled to the benefits of the statute though
not intending to use the crossing, and might recover for
damages sustained by reason of the frightening of his horse
because of the unexpected appearance of the train when no
crossing signal had been given.   Whether this case can now
be construed as authority for the extreme view that a traveler
on a parallel highway not expecting to use the crossing is
entitled to rely on the statute requiring crossing signals is
rendered more than doubtful by the partial disapproval of
that case in *Walters v. C., M. & St. P. R. Co.* 104 Wis. 251,
80 N. W. 451, and this latter case seems to have been the case
relied on by the trial judge in directing a verdict.   As matter
of fact, however, the *Walters Case* was not a case where a
train approached a crossing intending to pass over it and
failed to give the statutory signals.   The plaintiff was ap-
proaching a city crossing from the east driving his team and
was sitting on the hounds of his wagon.   A switch engine and
car was operating on the tracks somewhere north of the cross-
ing.   Before reaching the track he could see to the north a dis-
tance of 170 feet, but he did not look.   Just as he was cross-
ing the switch engine and car approached from the north, but
stopped, as it was intended it should, at a switch just before
reaching the crossing.   A flagman at the crossing did not
give the plaintiff notice of the approach of the switch engine.
The plaintiff's team became frightened at the noises made
by the engine and car and ran away, and he was injured by
being thrown from the wagon as the team turned a corner a
block east of the crossing.   This court reversed a judgment
in plaintiff's favor on two grounds: First, because he was
guilty of contributory negligence in not looking to the north;
and, second, because there was no duty on the part of the
railway employees to notify a traveler that a switch engine
which was not to cross the street was merely operating in the

vicinity. So far as the latter proposition was in conflict with the *Ransom Case,* that case was overruled, but no farther.

We do not see how the *Walters Case* controls the present case. Here a switch engine was approaching and about to pass over a highway crossing without signal, in violation of the statute. A traveler was approaching the crossing and listening for the signal. The circumstances were not such as to make it negligence as matter of law for him to approach without stopping. The evidence tended to show that by reason of the failure to give the statutory signal he was led to approach to a point nearer than he otherwise would have done, and to a point where the sight and noise of the coming train frightened his horses, causing them to become uncontrollable so that they dashed against the train. If these facts should be found by the jury the chain of proximate causation would be complete.

*By the Court.*—Judgment reversed, and action remanded for a new trial.