MICHAELS, Administrator, Respondent, vs. CHICAGO, BUR-
LINGTON & QUINCY RAILROAD COMPANY, Appellant.

*May 4—June 1, 1911.*

*Railroads: Negligence: Killing of person at private crossing: Duty to
signal approach of train: Questions for jury: Contributory neg-
ligence: Proximate cause: Evidence: Harmless errors: Special
verdict.*

1. In the absence of statute it is the duty of a railroad company to
signal the approach of a train to a private crossing if the cir-
cumstances are such that ordinary care for the safety of per-
sons using such crossing requires it.
2. It was a question for the jury in such case whether defendant
was negligent in failing to signal the approach of a train to a
private crossing which was dangerous by reason of an over-
hanging hill, a curve in the track, the difficulty in seeing or
hearing an approaching train, and the physical condition of
the crossing.
3. Upon approaching with his wagon and team the crossing in ques-
tion, plaintiff's intestate opened the gate and, leaving the team
in charge of his son, after looking and listening for a train,
started across the track to open the other gate, the team fol-
lowing about ten or twelve feet behind him.  Being suddenly
apprised of the approach of a train which had been hidden by
the hill and the curve in the track and which was running at
a high rate of speed, he turned back, grabbed the team, which
was then on the track, and pushed and backed them and the
wagon off the track.  He succeeded in clearing the track when
the train was about seventy-five feet away, but as the train
passed the horses reared and swung around and he was struck
a glancing blow by the engine from the effects of which he died.
*Held*, that in view of the quickness of decision required and the
physical condition of the crossing with a narrow driveway and
a high bank at the side, it could not be said as a matter of law
that the deceased was guilty of contributory negligence either
in placing himself in a position of danger, in failing to back
his team far enough, or in failing to step aside.
4. Whether under the circumstances stated the deceased would have
been justified in putting himself in the position he did merely
to save his property, is not decided, it sufficiently appearing

that his motive was to save his son who was driving the team, and that being a sufficient justification.

5. Upon the facts as stated, the fright of the horses cannot be regarded as the proximate cause of the injury.

6. Evidence of the failure of the trainmen to signal for a highway crossing about one mile before reaching the private crossing where the accident happened, even if improperly admitted, was not prejudicial to defendant.

7. There was no error in refusing to submit in the special verdict a question asking whether if the deceased, after reaching the crossing himself, had looked constantly up the track in the direction from which the train was coming, he could have seen such train before his team reached the crossing.

APPEAL from a judgment of the circuit court for Pierce county: E. W. HELMS, Circuit Judge. *Affirmed.*

This action was brought to recover for the unlawful death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant. The material allegations of the complaint respecting the defendant's negligence are, substantially, that for many years prior to the 5th day of December, 1908, the defendant had constructed and maintained a crossing over its tracks on the northeast quarter of the northeast quarter of section 12, township 25, range 18 west, in the town of Trenton, for the use of the public, upon a private road crossing defendant's railroad track; that said crossing was and is situated upon a heavy curve in said track, and that at said crossing the view of said track to the north is obstructed by reason of said curve and for the further reason that said track curved around on the opposite side of a hill, which obstructed the view from said crossing in a northerly direction, so that a person standing on said crossing could not see an object or an approaching train on defendant's track for a greater distance than 200 feet north of said crossing; that said crossing had been in constant and regular use by the public and the owners of the adjoining land for more than ten years prior to said 5th day of December, 1908, and that owing to the physical surroundings and the obstructions presented

to the vision said crossing was dangerous, as defendant well
knew; that it was the duty of said defendant in running and
operating its trains, when approaching said crossing from
the north, to ring the bell and blow the whistle and give sig-
nals of the approach of said trains; that on said 5th day of
December, 1908, and for many years prior thereto, a public
highway in said town of Trenton crossed the railroad track
of the defendant about three quarters of a mile north of said
private crossing, and it was the duty of said defendant, when
its trains approached said public crossing, to blow the whistle
eighty rods therefrom and ring the engine bell continuously
from said whistling point until said public crossing was
reached and crossed; that for many years prior to said 5th
day of December, 1908, it had been the habit and custom of
said defendant, when approaching the private crossing, to
sound the whistle eighty rods from said crossing and to ring
the bell continuously therefrom until said crossing was
reached and passed; that when said defendant sounded its
whistle for the public crossing three quarters of a mile north
of said private crossing, said whistle could easily be heard by
any person in the vicinity of the private crossing; that on or
about the 5th day of December, 1908, said deceased ap-
proached the said private crossing with intent to cross the
same with a team of horses hitched to a lumber wagon, ac-
companied by his two sons, with due care, caution, and pru-
dence, relying upon the aforesaid custom and duty of said de-
fendant to signal as aforesaid the approach of its trains to
said crossing; that while said deceased, with said team, accom-
panied by his two sons, was crossing said track said defend-
ant negligently and carelessly, at a high and dangerous rate
of speed, without any signal or warning of its approach, ran
an engine attached to a passenger train, coming from the
north, over said crossing, and struck and killed said deceased
without fault or negligence on his part; that in approaching
said crossing said defendant failed to sound the whistle at

either of the crossings above described, and negligently failed and omitted to ring the bell while approaching either of said crossings, and that. the failure of the said defendant to give said signals was the proximate cause of the death of said William Seater.

The material allegations of the complaint were put in issue by the answer. At the close of the evidence motion by defendant for directed verdict was denied. The jury returned the following verdict:

"(1) Was the whistle of the engine on train 52 sounded for the Red Wing crossing on the morning of December 5, 1908? A. No.

"(2) Was the whistle of the engine on train 52 sounded on the morning of December 5, 1908, after the train left Red Wing crossing and as the same approached the Seater private crossing? A. No.

"(3) If you answer question No. 1 'No,' then answer this: Would William Seater have been struck by the engine and injured if the whistle had been sounded for the Red Wing crossing? A. No.

"(4) If you answer question No. 1 'No,' then answer this: Would a person of ordinary judgment and experience in the business of defendant, in the light of the circumstances existing when the train approached the Red Wing crossing, ordinarily have anticipated that some injury might probably result to some person using the Seater private crossing, by reason of not sounding the whistle for the Red Wing crossing? A. Yes. .

"(5) If you answer question No. 2 'No,' then answer this: Would William Seater have been struck by the engine and injured as he was if the whistle had been sounded south of the Red Wing crossing and at a point north of the Seater crossing a reasonable distance from the same? A. No.

"(6) If you answer question No. 2 'No,' then answer this: Was the defendant company, through its employee in charge of the engine, guilty of any want of ordinary care in not sounding the whistle after leaving the Red Wing crossing as the train approached the Seater crossing? A. Yes.

"(7) If you answer question No. 2 'No,' then answer this:

Would a person of ordinary judgment and experience in the business of the defendant, in the light of the circumstances existing when the train approached the Seater private crossing, and before coming within sight of the same, ordinarily have anticipated that some injury might probably result to some person using the Seater crossing by reason of not sounding the whistle after leaving the Red Wing crossing and at a point north of the Seater crossing a reasonable distance from the same?     A. Yes.

"(8) Was William Seater guilty of a want of ordinary care for his own safety, which want of ordinary care contributed to his injury as a proximate cause thereof?     A. No.

"(9) Would a person in the exercise of ordinary care and prudence, situated as the deceased was when he started to back his team off from the railway track, have anticipated that death or serious bodily injury were likely to result to him from the danger to which he then exposed himself?     A. No.

"(10) If the plaintiff is entitled to recover in this case, at what sum do you assess his damages?     A. $8,000."

The usual motions were made by the defendant for judgment notwithstanding the verdict, upon the verdict, to change answers to questions in the verdict, for judgment, to set the verdict aside, and for new trial, all of which were denied and due exceptions taken.     The court ordered judgment upon the verdict in favor of the plaintiff, which was rendered, and from which this appeal was taken.

For the appellant there was a brief by *Woodward & Lees,* attorneys, and *John E. Foley,* of counsel, and oral argument by *G. M. Woodward.*     They contended, *inter alia,* that the statutory signals are given only for the benefit of persons approaching and about to use a public crossing.     *Williams v. C. & A. R. Co.* 135 Ill. 491, 26 N. E. 661; *Philadelphia & B. C. R. Co. v. Holden,* 93 Md. 417, 49 Atl. 625.     No law required such signals at a private crossing; there was no such custom; and the crossing in question was little used and not dangerous, to the knowledge of defendant.     The immediate and proximate cause of the accident was the fright of the horses.     *Walters v. C., M. & St. P. R. Co.* 104 Wis. 251; *Fla-*

*herty v. Harrison,* 98 Wis. 559; *Eastwood v. La Crosse City
R. Co.* 94 Wis. 163; *Abbot v. Kalbus,* 74 Wis. 504. Dece-
dent imperiled his life to save his property and was therefore
guilty of contributory negligence as a matter of law. *Will-
iams v. C., M. & St. P. R. Co.* 64 Wis. 1; *Schneider v. C.,
M. & St. P. R. Co.* 99 Wis. 378; *Miller v. Union R. Co.* 191
N. Y. 77, 83 N. E. 583; *Condiff v. K. C., Ft. S. & G. R. Co.*
45 Kan. 256, 25 Pac. 562; *Donahoe v. W., St. L. & P. R. Co.*
83 Mo. 560; *Evansville & C. R. Co. v. Hiatt,* 17 Ind. 102.

For the respondent there was a brief by *W. C. Owen* and
*White & Skogmo,* and oral argument by *Mr. Owen.* To the
point that it was the defendant's duty to signal the approach
of the train to the crossing in question, they cited *Winstanley
v. C., M. & St. P. R. Co.* 72 Wis. 375; *Cahill v. C., N. O. &
T. P. R. Co.* 92 Ky. 345, 18 S. W. 2; *Nichols v. C., M. & St.
P. R. Co.* 125 Iowa, 236, 100 N. W. 1115; *Hartman v. C. G.
W. R. Co.* 132 Iowa, 582, 110 N. W. 10; *Westaway v. C., St.
P., M. & O. R. Co.* 56 Minn. 28, 57 N. W. 222; *Czech v. G.
N. R. Co.* 68 Minn. 38, 70 N. W. 791; *Thomas v. D., L. & W.
R. Co.* 8 Fed. 729; *Louisville & N. R. Co. v. Bodine,* 109 Ky.
509, 59 S. W. 740, 56 L. R. A. 506; *Swift v. Staten Island
R. T. R. Co.* 123 N. Y. 645; *Kujawa v. C., M. & St. P. R.
Co.* 135 Wis. 562; *Eilert v. G. B. & M. R. Co.* 48 Wis. 606.

KERWIN, J. The questions raised by the assignments of
error are (1) negligence of defendant; (2) contributory negli-
gence of deceased; (3) improper admission of evidence; and
(4) denial of motion for new trial.

The private crossing where the injury occurred was known
as the Seater crossing, and the public crossing as the Red
Wing crossing, and the latter was one mile northwest of the
private crossing. There is evidence tending to show that the
defendant's track approaches the Seater crossing on a two-
degree curve. This crossing leads from the house and barn
of deceased on high land north or northeast to the track and to

the low land south or southwest of the track and runs diago-
nally across the right of way. The lower gate of this private
crossing is about 250 feet westerly from the upper gate. At
different points upon the right of way at this crossing one
could see northwest on the track a distance, varying with the
position occupied, from about 140 to 600 or 700 feet. A
whistle blown eighty rods above the public crossing could
sometimes be heard at the private crossing, sometimes not.
A person standing on the private crossing could at times hear
the rumbling of an approaching train before it came in sight,
sometimes not. This private crossing was used only by
Seater and a few others, his farm lying on both sides of the
railroad track. Deceased did not know much about the cross-
ing or the use of it, since he had lived with his brother only a
short time, having moved there from Iowa about three weeks
before the injury. Deceased knew trains passed very fre-
quently and knew one was going about the time of the injury,
but did not expect it so early, or did not think it was due at
the time of the injury, but still deceased was looking and lis-
tening for the train. The house in which deceased lived was
on a hill about twenty-five rods east of the upper gate of this
right of way. The private way extended down from the top
of the hill to a ravine, then passed along the edge of the ra-
vine on the side of the hill which caused the curve in the rail-
road track. This hill obstructed the view of the railroad
track to the north. The wagon track extending down the
hill to the crossing was narrow, about wide enough for a
wagon, and on the upper side of the wagon track was a bank
which continued down to the crossing. There is a bluff on
the upper side of the track, quite steep, about 150 feet high
from the track up to the top of the hill. A person standing
on the private crossing could hear the noise of an approaching
train only when it was a short distance from the crossing.

In the forenoon of December 5, 1908, deceased with his two
sons, Elmer, aged seventeen, and William, aged fifteen, left

the house on the top of the hill to cross the track to get a load of wood, Elmer driving. When they arrived at the upper gate they opened it and stopped and listened for a train, but did not hear any. Deceased went down to the crossing, looked and listened for a train, and then signaled Elmer to come on. He stood on the crossing looking and listening until Elmer was about sixty feet away, and then started for the lower gate, still looking north, the direction from which the train came. Elmer had his horses on the crossing and the deceased was about ten or twelve feet from the crossing when the younger son hollered that a train was coming. At that instant deceased started back, grabbed the team, which was then on the track, and pushed and backed them and the wagon off the crossing. At the time deceased was struck the rear wagon wheels were up against the bank. When the deceased ran back to the horses Elmer started to pull on the lines as quick as he grabbed the team. Deceased got the team entirely off the track when the train was seventy-five or one hundred feet away, and as he did so Elmer jumped off the wagon. As the locomotive passed, the horses reared and swung around, and the locomotive struck deceased a glancing blow, throwing him about forty feet east of where he was struck. The train was running a fraction over seventy feet a second. The blow killed the deceased, who at the time of his death was forty-four years of age and in good health. He left him surviving his widow and four children.

It is strenuously argued on the part of the appellant that a verdict should have been directed for the reason that there was no proof of negligence on the part of the defendant; that failure to blow the whistle and ring the bell as the train approached the Red Wing crossing and failure to blow the whistle and ring the bell while approaching the private crossing where the accident happened was not negligence. We shall spend no time on the negligence charged respecting the failure to give any warning as the train approached the public cross-

ing, but the question whether there was negligence in failing to ring the bell or sound the whistle when approaching the private crossing will be considered. No claim is made by defendant that the whistle was blown or the bell rung as the train approached the private crossing, and the question is whether the defendant, under the circumstances of this case, was guilty of negligence in failing to do so. No statutory duty existed to signal for the private crossing, and the question to be determined is whether the defendant was bound to do so at common law under the circumstances of this case.

The private crossing was constructed at the time the railroad was built some twenty years before the injury, and afterwards maintained by defendant. It had been used by the occupiers of the Seater farm and some others. The evidence shows that this private crossing was dangerous because of the overhanging hill, the curve, the difficulty in hearing an approaching train, as well as the physical condition of the crossing. There is evidence that at the speed the train was running it would be on the crossing in about ten seconds from the time it could be seen by a person standing on the crossing. The unwritten law, therefore, in the absence of statute, made it the duty of defendant to signal the approach of the train, if in the exercise of its duty ordinary care required it to do so. *Duffy v. C. & N. W. R. Co.* 32 Wis. 269; *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216, 35 N. W. 278; *Kujawa v. C., M. & St. P. R. Co.* 135 Wis. 562, 116 N. W. 249; *Winstanley v. C., M. & St. P. R. Co.* 72 Wis. 375, 39 N. W. 856; *Eilert v. G. B. & M. R. Co.* 48 Wis. 606, 4 N. W. 769; *Swift v. Staten Island R. T. R. Co.* 123 N. Y. 645, 25 N. E. 378; *Hartman v. C. G. W. R. Co.* 132 Iowa, 582, 110 N. W. 10; *Nichols v. C., M. & St. P. R. Co.* 125 Iowa, 236, 100 N. W. 1115.

In the instant case the court is of opinion that whether the defendant was guilty of negligence in failing to signal the approach of the train before reaching the private crossing was a question for the jury.

It is further argued by counsel for appellant that deceased was guilty of contributory negligence in putting himself in a place of danger in going upon the crossing and in failing to back his team a sufficient distance from the track, and that he failed to exercise care commensurate with the known danger. It is said that deceased in his own judgment considered he had reached a position of safety, was making no effort to push the horses further back or to step to one side, and *Walters v. C., M. & St. P. R. Co.* 104 Wis. 251, 80 N. W. 451; *Flaherty v. Harrison,* 98 Wis. 559, 74 N. W. 360; *Eastwood v. La Crosse City R. Co.* 94 Wis. 163, 74 N. W. 360; and *Abbot v. Kalbus,* 74 Wis. 504, 43 N. W. 367, are relied upon on this point. The cases cited do not rule the instant case in favor of appellant. In *Walters v. C., M. & St. P. R. Co., supra,* there was negligence in failing to look for the train. In *Flaherty v. Harrison, supra,* the case turned on the sufficiency of the evidence to carry the case to the jury on the claim of negligent ringing of the bell which frightened the horses. *Eastwood v. La Crosse City R. Co., supra,* involved the question of negligence in failure to stop a car on the appearance of danger to any one near the track. In *Abbot v. Kalbus, supra,* it was ruled that there was no evidence to carry the case to the jury on the question of the operation of defendant's locomotive. The evidence in the present case is ample to support a finding that the deceased exercised ordinary care in endeavoring to get his team as far off the track as he could in the few seconds he had to do it. He did not voluntarily put himself or his team in a place of danger. He was required to act instantly and without reflection or deliberation, since the train was practically upon him before he saw or heard it and going at a very high rate of speed. Moreover, there is evidence that in view of the narrow passageway for the wagon and the high bank in the rear he backed the horses as far as he could in his hurried effort to get them off the track. There is also ample evidence to support a finding that there was no negligence in failure to look or listen, or in

the movements of the team after it entered upon the right of way. It is also urged that the deceased was guilty of negligence in pushing the team off the track in the presence of danger in order to save his property, and that it was not done to save his son who was driving the team. It is said that the deceased rushed into danger for the purpose of saving his property, and that under all the authorities, in the absence of some imperative public or private duty, the attempt to save property would not excuse his action. It is not necessary to decide, and we do not decide, whether the deceased under the circumstances would have been justified in putting himself in the position in which he did merely to save his property, because there is sufficient evidence to support the verdict that the safety of his son was the impelling motive which induced him to rush the team off the track. And there is evidence that the train struck deceased at or about the time the boy jumped from the wagon. The safety of the boy was sufficient justification for the acts of the deceased in getting the team off the track. *Mobile & O. R. Co. v. Ridley,* 114 Tenn. 727, 86 S. W. 606; *Linnehan v. Sampson,* 126 Mass. 506; *Corbin v. Philadelphia,* 195 Pa. St. 461, 45 Atl. 1070, 49 L. R. A. 715; *Cottrill v. C., M. & St. P. R. Co.* 47 Wis. 634, 3 N. W. 376; *Pennsylvania Co. v. Langendorf,* 48 Ohio St. 316.

It is argued that the proximate cause of the injury was the fright of the horses, not the failure to signal the approach of the train. We do not regard this contention tenable. *Sarles v. C., M. & St. P. R. Co.* 138 Wis. 498, 120 N. W. 232; *Kujawa v. C., M. & St. P. R. Co.* 135 Wis. 562, 116 N. W. 249.

The evidence shows that the deceased used caution in going upon the crossing. He stopped at the upper gate and listened for a train, went on the crossing, and looked and listened. No train was in sight or could be heard, the evidence tends to show.

In so far as the answers of the jury to the questions in the special verdict are material to this case, in our view of it,

they are supported by the evidence, and hence the motions: to change the answers were properly denied.

The evidence respecting signals for the Red Wing crossing was, even if improperly admitted, not prejudicial, and the evidence tending to show that no signal was given on approaching the Seater or private crossing was properly admitted. Nor was there error in refusal to submit to the jury the question requested respecting the duty of the deceased to constantly look up the track in the direction from which the train was coming.

The court is of opinion that the judgment below is right and must be affirmed.

*By the Court.*—The judgment is affirmed.

MARSHALL, J., dissents.