17]          JANUARY TERM, 1914.          485

Shaffer v. Minneapolis, St. P. & S. S. M. R. Co. 156 Wis. 485.

SHAFFER, Respondent, vs. MINNEAPOLIS, ST. PAUL & SAULT
STE. MARIE RAILWAY COMPANY, imp., Appellant.

*February 26—March 17, 1914.*

*Railroads: Collision with traction engine at highway crossing: In-
jury to person at a distance: Reasonable anticipation: Negli-
gence: Speed of train: Caution at crossings: Giving of statu-
tory signals: Positive and negative testimony: Setting aside
jury's finding: Insufficient lookout on engine: Number in
train crew: Slackening speed of train: Inevitable accident.*

1. Where, as a result of a collision between a fast train and a
   traction engine at a highway crossing, a piece of iron was
   hurled through the window of plaintiff's house 147 feet dis-
   tant and injured her, such injury, though unusual, was not
   remote and was within the range of reasonable anticipation.
2. In view of the existing demand for fast train service, and the
   fact that the legislature has restricted the speed of trains
   only in cities and villages, a finding of actionable negligence
   cannot be sustained upon mere proof that a limited passenger
   train was operated through the open country at a speed of
   fifty-seven miles an hour.
3. Where a limited passenger train, in a run of 368 miles, en-
   counters 362 grade highway crossings, ordinary care does not
   require that it should be slowed down at each of such cross-
   ings.
4. The fact that between the whistling post and a point 300 feet
   distant from an ordinary grade crossing there is a one-degree
   curve in the track, the track being straight for a long dis-
   tance beyond those points in both directions, is not alone
   enough to require greater precautions in approaching such
   crossing than the statute prescribes, where the view of the
   track from the intersecting highway is unobstructed; al-
   though where there are special circumstances or conditions
   which should and ordinarily would induce an ordinarily pru-
   dent person to exercise greater caution, the rule may be differ-
   ent.
5. Positive testimony of the trainmen as to the giving of statu-
   tory signals as the train approached the crossing in question,
   considered in connection with the weather conditions, the
   negative character of opposing testimony, and the opportuni-
   ties for observation of the witnesses giving it, is *held* to have
   justified the trial court in setting aside the findings in the
   special verdict to the effect that the signals were not given.

6. It appearing that at this stage of his run the duties of the fireman in keeping up steam took all his time, the fact that he was not at the cab window when the collision occurred did not warrant a finding that he was negligent.

7. The number of men to be carried on a locomotive engine being regulated by sec. 1809r, Stats. 1913, it is not within the province of a jury to say that a railway company is negligent in not having a larger crew.

8. Where a traction engine is seen approaching a railway crossing under customary easy control, the operators of a train which is also approaching such crossing are not required to slacken its speed, but have the right to presume that there will be no attempt to cross ahead of it.

9. Where a traction engine was propelled upon a railway track under such circumstances that it was impossible to stop a train in time to avoid a collision after the trainmen, in the exercise of ordinary care, had observed it on the track, the mere fact of the collision does not justify a finding that the trainmen were negligent.

APPEAL from a judgment of the circuit court for Chippewa county: JAMES WICKHAM, Circuit Judge. *Reversed.*

The plaintiff brought this action against the appellant and W. C. Smith and John Lockins (Lokken) for personal injuries. On August 13, 1912, she was in her house, which was about 147 feet southwest of a highway grade crossing of the appellant railway. By reason of a collision at said crossing between a threshing traction engine on the highway and a train of the appellant on its track, caused, it is charged, by the joint negligence of both, a piece of iron was hurled across the intervening space through the window of plaintiff's house and struck her, causing the injuries complained of. The defendants answered separately, each denying negligence.

The jury returned a special verdict containing seventeen questions and answers: (1) The defendant failed to exercise ordinary care in running the train at a speed of fifty-seven miles per hour when approaching the crossing. (2) This was a proximate cause of plaintiff's injury. (3) The de-

fendant failed to blow the whistle eighty rods east of the crossing. (4) This was a proximate cause of plaintiff's injury. (5) Defendant failed to ring the engine bell continuously from the whistling post to the crossing. (6) This was a proximate cause of plaintiff's injury. (7) The defendant in approaching the crossing failed to keep a proper lookout. (8) This was lack of ordinary care. (9) This was a proximate cause of plaintiff's injury. (10) The defendant could have stopped the train in time to avoid the collision after the traction engine should have been first seen from the cab of the engine. (11) In failing to stop the train in time the defendant did not exercise ordinary care. (12) This was the proximate cause of plaintiff's injury. (13). Defendants Smith and Lokken failed to look or listen for an approaching train before going onto the railway track at the crossing. (14) This was the proximate cause of plaintiff's injury. (15) Defendants Smith and Lokken failed to exercise ordinary care in attempting to cross the railway track with their threshing outfit at the time and in the manner they so attempted. (16) This was the proximate cause of plaintiff's injury. (17) Plaintiff was damaged in the sum of $3,300.

On motion the court struck out, for want of evidence to support it, the affirmative answer to question 3 and substituted in lieu thereof the answer "No;" the affirmative answer to question 5 and substituted in lieu thereof the answer "No;" and the affirmative answers to questions 4 and 6; and gave judgment against all the defendants for the damages mentioned.

For the appellant there was a brief by *W. A. Hayes,* attorney, and *John L. Erdall,* of counsel, and oral argument by *Mr. Hayes.* They contended, *inter alia,* that there was no actionable negligence in running the train at the speed shown, since the facts demonstrated the necessity therefor if the train was to make its schedule time, perform its public

duties, and make necessary mail connections. *Jordan v. Osborne,* 147 Wis. 623, 133 N. W. 32; *Sutton v. C., St. P., M. & O. R. Co.* 98 Wis. 157, 73 N. W. 993; *Muster v. C., M. & St. P. R. Co.* 61 Wis. 325, 334, 21 N. W. 223; *Schofield v. C., M. & St. P. R. Co.* 114 U. S. 615, 5 Sup. Ct. 1125; *Newhard v. Pa. R. Co.* 153 Pa. St. 417, 26 Atl. 105, 19 L. R. A. 653; *Lake Shore & M. S. R. Co. v. Barnes,* 166 Ind. 7, 76 N. E. 629; *Partlow v. I. C. R. Co.* 150 Ill. 321, 37 N. E. 663; *Omaha & R. V. R. Co. v. Talbot,* 48 Neb. 627, 67 N. W. 599; *Custer v. B. & O. R. Co.* 206 Pa. St. 529, 533, 55 Atl. 1130; *McKonkey v. C., B. & Q. R. Co.* 40 Iowa, 205; 2 White, Pers. Inj. on Railroads, § 970; *Chicago & N. W. R. Co. v. Bunker,* 81 Ill. App. 616. There was no negligence in regard to a lookout; the engineer kept constant watch and the fireman all that was possible; and it was not for the jury to say that there should have been a third man on the engine. *Newhard v. Pa. R. Co., supra; O'Brien v. Wis. Cent. R. Co.* 119 Wis. 7, 96 N. W. 424; *Louisville & N. R. Co. v. Gilmore's Adm'r,* 131 Ky. 132, 109 S. W. 321; *Louisville & N. R. Co. v. Creighton,* 106 Ky. 42, 50 S. W. 227; *Brammer's Adm'r v. N. & W. R. Co.* 104 Va. 50, 51 S. E. 211; *Northeastern R. Co. v. Martin,* 78 Ga. 603, 3 S. E. 701; *Frost v. M. & N. R. Co.* 96 Mich. 470, 56 N. W. 19; *Western R. Co. v. Lazarus,* 88 Ala. 453, 6 South. 877; *Howard v. L., N. O. & T. R. Co.* 67 Miss. 247, 7 South. 216; *Houston & T. C. R. Co. v. Smith,* 77 Tex. 179, 13 S. W. 972; *Early's Adm'r v. L., H. & St. L. R. Co.* 115 Ky. 13, 72 S. W. 348.

For the defendants Smith and Lockins there was a brief by *W. H. & T. F. Frawley.*

For the respondent there was a brief by *D. Buchanan, Jr., V. W. James,* and *Thomas D. Schall,* and oral argument by *Mr. James* and *Mr. Buchanan.*

TIMLIN, J.   The consequence of the collision complained of is unusual but not remote.   It was within the range of

reasonable anticipation that fragments might fly and, flying, might strike some person or object, and the fact that this particular fragment flew a long distance and entered a house before striking the plaintiff would not bring the case within the rule of *Hasbrouck v. Armour & Co.* 139 Wis. 357, 121 N. W. 157. The highway and the railroad run nearly east and west and are nearly parallel for a considerable distance easterly and westerly of the crossing in question. Coming upon the highway from the east and along the south side of the railroad right of way we reach a place where the highway makes a turn to the north, crosses the railroad tracks diagonally, then turns west, and continues west on the north side of the right of way and nearly parallel therewith. The roadbed of the railroad at the crossing is three or four feet higher than the level of the highway, and the wagon tracks slope up to the rails for several feet. The crossing is furnished with a plank outside and inside each rail lying parallel with the rails. For 318 feet east from the crossing the railroad track is straight. From that point east 944 feet the track is slightly curved. There is what the railroad engineers call a one-degree curve. This indicates the curve of a segment of the circumference of a circle of which circle a chord of 100 feet in length will represent one degree, or in other words a circle of about 2.2 miles diameter. Fifty-eight feet further on and 1,320 feet or eighty rods from the crossing is the whistling post. There is nothing to conceal an approaching train from the eastward view of one on the highway at any point within three or four rods of the rail. The colliding bodies were the railroad company's high-speed limited passenger train *en route* from Chicago to Minneapolis and the threshing traction engine and boiler of the defendants Smith and Lokken; the time was about 12:30 p. m. on August 13, 1912, the day fair, the wind from the northwest with a velocity of about sixteen miles per hour. The track is straight for a mile or more eastward of the whistling post and westward of the crossing in question.

Counsel for appellant contends there was no evidence to support the jury findings 1, 7, and 11. In addition to controverting this claim, respondent's counsel contends that the trial court erred in changing the answers of the jury to questions 3 and 5, and seeks to support the judgment also on her exceptions to such ruling.

First. With reference to jury finding (1), it appears without controversy that the train in question was what is known as a limited passenger, carrying seven coaches. It leaves Chicago at 2:45 a. m., runs to Minneapolis, and arrives at the latter city, a distance of 465 miles, at 4:40 p. m. There are about sixty-five stops on this trip and the average stop is three to five minutes. The train is drawn by three different engines, the first being from Chicago to Fond du Lac, the second from there to Chippewa Falls, the third from there to Minneapolis. It takes half an hour to get out to the city limits of Chicago and about half an hour to go the ten miles from St. Paul to Minneapolis. Three hundred and sixty-eight miles of this trip are through the state of Wisconsin, and in this part of its route there are 362 grade crossings without gates, flagmen, or bells and somewhat similar to the crossing in question. About sixty miles of this distance is through incorporated cities and villages, where a low maximum speed is prescribed by statute. The crossing in question is between Cadott and Chippewa Falls, which stations are twelve and three-tenths miles apart, and, allowing for stops and slowing up, the train had fourteen minutes in which to make that distance.

It must be apparent that to make the schedule time between Chicago and Minneapolis under the circumstances above detailed the train must reach a speed of sixty miles an hour or thereabouts on some parts of the route. During a run of fourteen hours a locomotive cannot be always kept at its full-speed efficiency even between crossings and outside of cities and villages, and an absolutely uniform rate of speed

even in the open country is not always possible.   In the 368 miles of the trip through Wisconsin the train passes over 362 grade crossings, so that the mere fact that the train is approaching a crossing cannot require a slackening of this necessary speed because the train is practically always approaching a crossing.   The curve described between the whistling post and the crossing in question, considering the absence of obstruction to the view of an approaching train, is not alone enough to call for precautions greater than those required by statute law.   Ordinary observation must convince every one that such a high-speed train on such a trip is approaching or passing over such curves every few minutes during the greater part of its journey.   To decide in the face of these uncontroverted facts that the speed in question was such as to form a basis for a finding of want of ordinary care would be to set up an artificial and arbitrary standard of ordinary care which all know is not practiced by those engaged in like business under like circumstances.   Those in charge of the operation of such trains are required to make the schedule time; it can only be done by such speed in the open country, and if there is any one to blame it must be the managers of the railroad in imposing such a schedule upon their employees.   But such managers are required by public demand and by competitive forces to do so, and the statute law, by regulating speed in other places, impliedly permits the managers to arrange their own schedule and regulate their own speed at these places.   *Jordan v. Osborne,* 147 Wis. 623, 133 N. W. 32; *Sutton v. C., St. P., M. & O. R. Co.* 98 Wis. 157, 73 N. W. 993.   It would require a positive rule of law, rather than a comparison with what ordinarily prudent persons do under like circumstances, to make the rate of speed alone negligence.   It is not the function of the jury to establish a rule of law, hence there was nothing to support the first finding of the jury.   Courts have in the past established certain rules of ordinary care which in time

became rules of law, and excluded the power of the jury to compare the conduct in question with that of an ordinarily prudent person under the same or similar circumstances. But this was done only in very clear cases. *White v. M., St. P. & S. S. M. R. Co.* 147 Wis. 141, 133 N. W. 148. It is for the legislature, not for the courts, to say that the defendant shall change its train schedule, and this is what holding the defendant negligent on the ground of excessive speed would amount to. When there are special circumstances or conditions which should and ordinarily would induce an ordinarily prudent person to exercise greater caution, the case is different. *Michaels v. C., B. & Q. R. Co.* 146 Wis. 466, 474, 131 N. W. 892.

The actual speed of the train is fixed by the evidence. Witnesses estimate the speed at not less than sixty miles per hour, while a speedometer on the engine registered fifty-seven miles per hour. There is no room for estimate or even conjecture. Fifty-seven miles per hour is that speed found by the jury and most favorable to support the judgment, and hence fifty-seven miles an hour it must be. But this immovable fact affects all the other facts in a most extraordinary manner. The distance from the center of the crossing between the tracks east to the whistling post is 1,320 feet or eighty rods. Hence the time in which all the transactions testified to occurred is 15.8 seconds. The ordinary velocity of sound in still air at ordinary temperature would cut off from this 1.2 seconds; with the wind blowing as it was, still more. This would not, of course, limit the time of the train's travel, but would limit the time for getting over the crossing after the signal was given and heard. The threshing rig, consisting of a traction engine fifteen feet long, a separator twenty feet long hitched by its pole to the rear of the traction engine, made a moving train forty or forty-five feet long, allowing ten feet for the pole and connections. The highest speed at which this moved was four miles per

hour, and it slowed down to one mile per hour for safety to the tractor and separator in approaching and crossing the rails diagonally. The owner of the threshing outfit, on the tractor steering, knew the limited train was about due. It was not possible for this threshing rig to cross in this way in 14.6 seconds or in 15.8 seconds had the train given all the statutory signals. That is a very simple matter of computation. To cross the zone of contact the rig should travel fifty or fifty-five feet. This matter of time and speed also affects the testimony relative to failure to keep a lookout and that relative to giving or failing to give the statutory signals. With reference to the alleged failure to give the statutory signals there were several witnesses about one quarter of a mile further west than the crossing in question who testified that they were watching the train while the train was at or near the whistling post and heard no signals, but one testifies (and his testimony is not disputed) that thick, black smoke was issuing from the smokestack. The wind was blowing from the west. Under such circumstances the distance and direction of the wind with attention to other duties may have prevented hearing, and the steam issuing from the whistle with the smoke and smokestack between it and the observer would not shoot up as from a train standing still or moving slowly, but would trail along mingled with the smoke about level with and behind a train moving at fifty-seven miles per hour. The testimony of these witnesses is not inconsistent with the fact that the train was somewhat west of the whistling post when they observed it. The trainmen testify that the statutory signals were given. Their testimony was positive; the other was in substance negative, although in form not so, and the opportunities for observation by the witnesses who testified to the omission of signals were very imperfect. The time was too short and the movement too swift for any accurate or reliable observation from their viewpoint. The men in immediate charge of the threshing rig do not pretend

to know or else give purely negative testimony.    The learned
circuit judge who presided and heard the evidence must be
supported in his ruling setting aside the answers to questions
numbered 3 and 5.

Witnesses on the part of the plaintiff testify that the train
did whistle, some say just as it left the west end of the curve,
some say at forty rods distant, and one witness, who was
about one fourth of a mile west of the crossing and the train
coming toward him at the speed stated, testifies that the train
did not whistle until within twenty feet of the tractor.    All
this refers, not to the crossing signal, but to the alarm or
danger whistle, which the trainmen say was also sounded as
soon as the tractor was observed on the crossing and at about
500 feet distant therefrom.    The automatic bell was still
ringing when the train stopped after the collision, but no one
seems to have heard it before.    This testimony on the part of
the plaintiff tends to corroborate the trainmen and clashes
with other testimony on the part of the plaintiff tending in
some slight degree to sustain the charge that a proper lookout
was not kept.    Omitting for the present the fact that the
fireman was not at the cab window on the left side, the testi-
mony of the engineer is that he blew the whistle at the whist-
ling post and was at his post at the throttle lever keeping a
lookout, saw the tractor on the track at the crossing when
about 500 feet therefrom, then blew the alarm whistle, then
set the air brake, which brought him within about 100 feet
of the tractor.    He then called to his fireman and both
crouched down below the boiler head to avoid being hit with
flying missiles or swept off with the cab in the then inevi-
table collision.    This was quite a number of movements to
make in six seconds.    There is no room for doubting that he
made all these movements within six seconds or less.    He did
not see the tractor before because he was at his place on the
northerly or right-hand side of the cab and the tractor was
approaching from the other side.    The testimony of plaint-

iff's witnesses that there was no one at the lookout window on the engineer's side must relate to the second he was crouching behind the boiler head, for all agree he blew the alarm whistle, although, as might be expected, all disagree as to the distance of the locomotive from the tractor when the alarm whistle was first blown. Distance was being devoured pretty rapidly about that time, and what was actually done by the engineer, if done swiftly, measures fairly well with time and distance.

It is conceded that the fireman was not at the lookout window on the south or left-hand side at any time during the run from the whistling post to the place of collision. He testifies that he began work at North Fond du Lac that morning at 6:45 a. m. and they were nearing the end of his run at Chippewa Falls. In this time he had to shovel ten tons of coal, the last five tons twice, shake down the grates, rake the fire, wet down the coal, take on water at stops, clean the deck of the cab, take signals at the fireman's side, and keep a lookout. He could not look out standing on the deck of the cab, but must go up two steps into the proper position. His duties were such that he could not look out more than one minute in seven. At the time in question he had less time than usual to look out, for the coal in the tender at the end nearest to the boiler had been consumed and he was obliged to bring the coal from the rear end of the tender forward and also to feed it into the firebox with sufficient regularity to keep up steam, and at this stage of the journey that took all his time. It would not be possible to keep up the required steam on this train and also keep a lookout at all curves and crossings. The locomotive engine at high speed has a rocking or rolling motion and he would lose about a second in focusing an object on the track or very near it, but he says if he had seen this traction engine he would not have known it was going to attempt to cross. This testimony is not controverted and is no doubt true.

It is argued that the defendant should under the circumstances, in the exercise of ordinary care, have had two firemen on this engine or at least an extra lookout man. But the statute seems to cover this. Sec. 1809r, Stats. 1913. The jury could not say that this fireman was negligent in not being at the cab window at this particular time under the circumstances, nor that the defendant must have a larger crew than the statute requires.

Again, this tractor was either on the track or approaching it when the train was at the whistling post. If approaching the track and under such easy control as such machines are, the train was not obliged to slacken its speed for it, for the operators had a right to presume it would stop before attempting to cross ahead of the oncoming train. If on the track at that time, the trainmen, as the evidence shows, at once upon observing this took every precaution. It requires no evidence to show that it was utterly impossible to stop a train of this weight and speed in time to avoid a collision after the trainmen, in the exercise of ordinary care, had observed the traction engine on the track. It is not the law that an object can be by third persons put upon a railroad track in such a way that a collision therewith is inevitable and then charge the railroad men with negligence merely on the ground that a collision occurred. There must have been some lack of ordinary care causing the injurious result on their part or on the part of the railroad company through other agents. We find no such evidence in the record. We have not found it necessary to consider the rule of the New York cases cited in *Ransom v. C., St. P., M. & O. R. Co.* 62 Wis. 178, 22 N. W. 147 (overruled on another point in *Walters v. C., M. & St. P. R. Co.* 104 Wis. 251, 260, 80 N. W. 451), with reference to the alleged omission of statutory signals.

*By the Court.*—Judgment reversed as to the appellant only, and remanded with directions to dismiss the complaint as to the appellant only.