WEBSTER, Respondent, vs. ROTH, Trustee (CHICAGO & NORTH WESTERN RAILWAY COMPANY), Appellant.*

*January 17—March 13, 1945.*

\* Motion for rehearing denied, with $25 costs, on May 1, 1945.

536

*John F. Baker* of Milwaukee, for the appellant.

For the respondent there were briefs by *Rieser & Mathys* of Madison, and oral argument by *C. G. Mathys*.

BARLOW, J.    The first question presented is whether Sugar avenue was a public-traveled grade crossing under sec. 25.16 of the Madison city ordinances, which is practically identical with sec. 192.29 (1), Stats.    This question was submitted to the jury in the special verdict and answered in the affirmative.

It appears that in 1906 the United States Sugar Company had a factory north of the railway right of way, and that Sam R. Miller owned lands south of the right of way.    The sugar company was desirous of obtaining a shorter route for its patrons to reach the plant.    On July 6, 1906, Sam R. Miller conveyed a strip of land two and one-half rods wide from the Cottage Grove road in a northeasterly direction to the middle point of the door sill of the main front door of the United States Sugar Company building, which is now the

Garver Supply Company building. On August 27, 1906, the village of Fair Oaks adopted an ordinance accepting the land to be used for public highway purposes and approved an agreement between the United States Sugar Company and the village of Fair Oaks for the improvement of the land deeded by Sam R. Miller, which is now Sugar avenue, whereby the sugar company agreed with the village to improve this land for highway purposes on condition that the amount expended be credited on its taxes. The sugar company wrote the railway company on September 6, 1906, that in order to accommodate their farmers it was necessary to build a highway from the center of their factory west across the railway right of way to the Cottage Grove road, which would shorten the hauling of sugar beets by more than three fourths of a mile, requesting the railway company to grant them a proper right of way across the railway right of way. The way was improved under the supervision of defendant's foreman and traveled by the public thereafter.

Counsel for the company contends that no street or highway was dedicated across its right of way; that it was not laid out or adopted as a street by the municipal authorities; and that it did not become a public street by user, thus making it an ordinary private crossing, as to which the ordinance has no application. The testimony shows that an average of one hundred automobiles, trucks, and vehicles traveled this route daily. The Minneapolis-Moline Power Implement Company, Madison Silo Company, the Garver Supply Company, Capitol Fence Company, International Harvester Company, and others opened places of business north of the railway right of way. Their employees, customers, and the public generally traveled this route over a long period of years. The railway company maintains a cross-buck sign marked "Railroad Crossing" at the crossing, as required by sec. 192.29 (5), Stats.

Sugar avenue, at the time it was laid out, accommodated no one and served no purpose unless the public was permitted to

cross the railway right of way to the places of business to the north. The railway company licensed the public to travel over its right of way at this point. It was improved for travel in accordance with the requirements of the railway company. It was clearly a public-traveled grade crossing within the meaning of that term as used in the ordinance.

There is some testimony that there was a gate on the south side of the right of way for a few years, but there is no testimony that it was closed or used to prevent the public from traveling, nor were there any signs to the effect that it was a private crossing.

The ordinance limiting the rate of speed of trains at public-traveled grade crossings to fifteen miles per hour was passed for the protection of the public. It was said in *Ewen v. Chicago & N. W. R. Co.* (1875) 38 Wis. 613, 634, in construing a like provision:

"Its object is manifest, and it is to diminish the chances of collision and loss of life by requiring trains to be run at a low rate of speed within the limits of a city, and while crossing highways where persons are constantly passing."

The evidence is undisputed that a grade crossing was established over the railway right of way at the point in question for public travel, and that the public traveled it as such. It is therefore considered that there is ample evidence to sustain the finding of the jury that it was a public-traveled grade crossing.

In the special verdict the jury found there were four causes contributing to the accident: First, the operation of the train by the defendant railway company at a highly excessive rate of speed; second, the failure of the engineer to blow the whistle at a time when he himself recognized that it might have averted the collision; third, the failure of Webster, deceased, driver of the automobile, to maintain a proper lookout; fourth, failure of Webster properly to listen.

Appellant railway company argues that even if the roadway was a public-traveled grade crossing neither the speed of the train nor the failure of the engineer to sound the locomotive whistle at some particular point was a legal cause of the accident. It is argued that when Webster was in a position of safety he could see the train for a distance of eleven hundred feet, and that the speed of the train, therefore, had nothing to do with his failure to stop his automobile. It is reasoned he would have failed to do so even though the train may have been traveling fifteen miles per hour or less.

The train in question was what is known as the "400" and is operated by a Diesel engine. This is a quieter and smoother-running train and makes less noise as it travels along the tracks than the ordinary old steam engine. It was traveling at more than three times the lawful rate of speed permitted at this point, the maximum lawful rate of speed being fifteen miles an hour and the speed of the train being fifty miles per hour. A modern train of this type traveling at fifty miles an hour gives the average traveler much less time to see the train approaching and to bring his automobile to a stop than it would if the train was traveling at fifteen miles per hour. In *Ellis v. Chicago & N. W. R. Co.* (1918) 167 Wis. 392, 167 N. W. 1048, it was said that when the unlawful rate of speed caused or contributed to the injury, proximate cause follows as a matter of law. In the case of *Shaver v. Davis* (1922), 175 Wis. 592, 601, 185 N. W. 227, it was said:

"Although the engineer might not have anticipated the specific injury to the plaintiff, it is reasonable that he should have anticipated that travelers might undertake to cross the track even though a train might be in sight, and that accidents were more likely to happen if the train was running at an illegal than at a legal rate of speed. Under the testimony the jury may have believed that if the train had been going twelve miles an hour or less, the accident would not have happened at all. *Ellis v. C. & N. W. R. Co.* 167 Wis. 392, 402, 167 N. W. 1048,"

It is considered that there is ample evidence to sustain the finding of the jury that the illegal speed of the train was causal.

The engineer testified that he saw the automobile when the train was two hundred to two hundred fifty feet away, and that he thereafter blew his whistle to attract the attention of the driver of the automobile, and that he again sounded the whistle when he was about eighty feet from the point of the accident. There is a dispute in the testimony as to whether he blew the whistle when he first saw the automobile, the engineer having testified on adverse examination prior to trial that he first blew the whistle when about eighty or ninety feet from the accident, and this is in accord with the testimony of other witnesses. The regular parking place for automobiles was in front of the office building of the Garver Supply Company, the office building shutting off the view to the east, the direction from which the train was coming. This is a known condition to the employees of the railway company, and the driver of an automobile would not be in position to see the train until he was near the right of way and the side tracks, about forty feet north of the main track. While the statute does not require the defendant to blow a whistle at a grade crossing within a municipality if the man in charge of the engine saw the deceased approaching the crossing and about to go upon the track, and believed that he was unaware of the train's approach, it would be his duty to sound the whistle as well as to take every other reasonable precaution to prevent the collision. *Heddles v. Chicago & N. W. R. Co.* (1889) 74 Wis. 239, 42 N. W. 237; *Piper v. Chicago, M. & St. P. R. Co.* (1890) 77 Wis. 247, 46 N. W. 165. It is a general rule of law that, in the absence of statute, it is the duty of employees of a railway company to signal the approach of a train if, in the exercise of their duty, ordinary care requires them to do so. *Michaels v. Chicago, B. & Q. R. Co.* (1911) 146 Wis. 466, 131 N. W. 892, and cases there cited. It is considered there is ample evidence to sustain the finding of the jury that

the failure to blow the whistle at a time before the engine was within eighty or ninety feet of the accident was causal negligence.

The jury found the driver of the automobile causally negligent in failing to maintain a proper lookout and in failing properly to listen. Appellant contends that assuming the railway company guilty of the negligence found by the jury, the negligence of Webster was as great as or greater than the negligence of the railway company employees. The jury assessed the negligence of the railway company as sixty per cent of the cause of the accident and that of Webster as forty per cent. The action was fully and fairly tried by able counsel on both sides and submitted to the jury under proper instructions by the trial judge. This court has many times held that no rule of thumb can be laid down with respect to the apportionment of negligence between a plaintiff and a defendant. *Fronczek v. Sink* (1940), 235 Wis. 398, 400, 291 N. W. 850, 293 N. W. 153. In *Hansberry v. Dunn* (1939), 230 Wis. 626, 633, 284 N. W. 556, the court said:

"It is true that the court may occasionally be able to determine from the record that two items of negligence of the same character are equal in quality or that as a matter of law one of them is greater than the other. . . . In any event, it must be possible from all the circumstances of the case as disclosed by the record for this court to be able to say that the negligences are equal in quality and that is why this court has said that it can rarely come to this conclusion."

We cannot say as a matter of law that the jury's comparison of the negligences involved is improper. We have no right to substitute our judgment for the judgment of the jury under the evidence in this case.

Other questions raised have been fully considered, but we do not consider it necessary to discuss them in this opinion.

*By the Court.*—Judgment affirmed.