Moyer, Special Administratrix, Respondent, vs. City of Oshkosh, Appellant.

*December 11, 1912—January 7, 1913.*

*Municipal corporations: Claims: Presentation: Form and construction: "Legal representatives:" "Heirs:" Death from negligence: Open drawbridge: Lights and danger signals: Traveler on bicycle: Contributory negligence: Evidence: Questions for jury: Special verdict: Consistency: Limit of recovery for death: Statutes: Misleading title.*

1. Under secs. 925—58 to 925—60, Stats., claims for personal injury or death must be presented to the city council, and only by such presentation and an appeal as therein provided can the circuit court acquire jurisdiction.

2. A recovery under secs. 4255, 4256, Stats., for the death of a person is not on behalf of his estate but for the benefit of the surviving widow, if there be one; and it is only in a case where there is a substantial period of suffering between the injury and the death that both causes of action may co-exist.

3. No great amount of formality is required in claims presented to a municipal corporation, and a construction which will preserve a *bona fide* claim is to be preferred to one which will have the effect to cut it off without trial.

4. Thus, a claim presented by a widow as special administratrix of the estate of her deceased husband, for damages sustained on account of his death by "the estate and his legal representatives and heirs," which shows upon its face that death ensued instantaneously, should not be limited, by a narrow and technical construction of the terms "legal representatives" and "heirs," to a mere claim in favor of the estate, but those words should be construed in a popular sense and as including the widow; and so construed it constitutes a claim under secs. 4255, 4256, Stats., in favor of the widow as beneficiary.

5. Evidence showing, among other things, that there was no warning light or danger signal in the usual and ordinary line of vision when deceased rode on his bicycle into the open draw of a bridge; that the night was dark, with snow, sleet, and a high wind; that the bridge was insufficiently lighted; and that to the knowledge of the deceased there was a system of gongs which were supposed to ring when the draw was open, but that they failed to operate at the time of the accident, is *held* sufficient to sustain a finding by the jury that the deceased

was not guilty of contributory negligence. *Stephani v. Manitowoc*, 101 Wis. 59, distinguished.

6. The fact that travelers on foot who heard the warning bell rung before the bridge opened, and who were on the lookout for it, testified that they could see the open draw, did not require the court to reject the jury's finding to the effect that the conditions were such that an ordinarily careful traveler approaching the draw might not see that it was open in time to save himself.

7. One who, from past experience, has reason to believe that a continuous alarm is sounded at a bridge while it is open, may well be excused for approaching such bridge in the darkness with greater confidence than one who knows there is no such alarm.

8. The fact that the trial judge struck out one finding in the special verdict, to the effect that the deceased, if he had looked, could not have seen, before he reached the draw, that it was open, was not inconsistent with his leaving undisturbed another finding, in substance that the bridge was so poorly lighted that an ordinarily prudent traveler, under the circumstances surrounding the deceased at the time, might approach the draw without seeing that it was open until too late to save himself.

9. In an action for death under secs. 4255, 4256, Stats., although such death resulted proximately from the negligence of a town or city as to keeping a highway in repair, the recovery is not limited to $5,000, notwithstanding that is the limit of recovery under sec. 1339 for injuries caused by defective highways.

10. The amendment of sec. 4256 by ch. 581, Laws of 1907, whereby the limit of recovery in actions for death was changed from $5,000 to $10,000, is not applicable only to actions against railway companies, although entitled "An act to amend section 4256 of the statutes relating to the liability of railway companies for the death of any person."

11. The law of 1907 being a general, not a private or local, law, the fact that its title is misleading and erroneous does not affect its validity.

VINJE, J., dissents.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Affirmed.*

This is an action to recover damages on account of the death of George B. Moyer, the plaintiff's intestate, a man about forty-five years of age, who attempted to cross Main

street bridge in the city of *Oshkosh* at about 6:30 o'clock on
the evening of November 15, 1909, and was precipitated into
Fox river through the open draw and drowned.    He left
surviving him his widow (the plaintiff) and several minor
children.    Moyer was riding a bicycle and was approaching
the bridge from the south.    He passed over the approach, 125
feet in length, and apparently did not see that the draw was
open until it was too late to save himself.    There was evi-
dence that the evening was stormy.    A number of witnesses
testified that it was raining and snowing.    Others denied that
there was rain or snow at the time, but all agreed that it was
dark, cloudy, and windy.    The intestate was drowned before
help reached him, his body was recovered on the following
day, and the right leg found to be broken in two places.    The
negligence charged against the city consisted of the failure to
give proper signals or warnings to show that the draw was
open and the failure to provide proper guards and lights.

The following notice and demand was served on the city
November 29, 1909:

"*To the City of Oshkosh, the Mayor and Common Council
thereof.*
"*To Daniel Witzel, City Clerk of the said City of Oshkosh,
Wisconsin:*
"I, *Lena Moyer,* special administratrix of the estate of
George B. Moyer, deceased, do hereby make claim against the
city of *Oshkosh,* Wisconsin, in the sum of ten thousand
($10,000) dollars, for damages sustained to the estate of
George B. Moyer, his legal representatives and heirs, under
the following circumstances:
"On the 15th day of November, A. D. 1909, about 6:30 in
the evening, at the city of *Oshkosh,* Wisconsin, while said
George B. Moyer was riding a bicycle on the bridge spanning
the Fox river, connecting Main street with South Main
street in the city of *Oshkosh,* said bridge at said time having
no gates or barriers to prevent persons walking, riding or
driving over said bridge from going into the waters of said
Fox river when said draw was open for the passage of boats,

and no proper signals being sounded or warning given to per-
sons walking, riding or going over said bridge at said time;
and said bridge at said time being improperly lighted while
the said George B. Moyer was riding his bicycle, going north
on said bridge from South Main street to Main street on the
north side of the river, said draw at said time being open for
the passage of a steamboat; the said George B. Moyer was
precipitated into the waters of said Fox river; and then and
there drowned without any negligence on his part whatsoever.
And said estate and the legal representatives thereof, claim
the sum of ten thousand ($10,000) dollars damages.

"Lena Moyer,

"Special Administratrix of the

Estate of George B. Moyer, deceased."

The claim having been disallowed by nonaction of the city
council, an appeal was taken to the circuit court for Winne-
bago county, where formal pleadings were filed and the ac-
tion tried before a jury, which returned the following special
verdict:

"(1) Did the said George B. Moyer ride off said Main
street bridge on a bicycle and meet his death by drowning at
the time and place alleged in the complaint? A. (by the
court). Yes.

"(2) Did the lighting system used on the said Main street
bridge at the time in question and long previous thereto ren-
der the bridge insufficient and unsafe for persons traveling
over the same on vehicles, in the exercise of ordinary care and
prudence? A. Yes.

"(3) At the time and place complained of, did the absence
of the guard or gate at the end of the approach next to the
drawbridge make travel over and along the roadway of said
bridge on vehicles, unsafe or dangerous to persons using ordi-
nary care and prudence? A. Yes.

"(4) Was the system of gongs and bells in use on said
bridge at the time and place complained of, and for many
months previous thereto, so defective and insufficient as to
make the bridge as to persons traveling over and along the
roadway thereon on vehicles unsafe and dangerous to travel-
ers thereon using ordinary care and prudence? A. Yes.

"(5) If you answer question 2 or 3 'Yes,' then was the fact therein found the proximate cause of the death of said George B. Moyer? *A.* Yes.

"(6) Did any want of ordinary care and prudence on the part of said George B. Moyer at the time and place in question contribute to produce his death? *A.* No.

"(7) Was the said bridge at the time said Moyer was drowned lighted so as to enable a traveler on the roadway thereof, approaching the open draw, in exercise of ordinary care and prudence, to see that the draw was open before he reached the draw? *A.* No.

"(8) Were the cluster lights on the south span of the bridge burning at the time said Moyer fell into the river? *A.* Yes.

"(9) On the night in question, at the time said Moyer was upon this bridge and before he reached the draw, could he have seen that the draw was open if he had looked? *A.* No.

"(10) If the plaintiff is entitled to recover, at what sum do you assess her damages? *A.* $7,000."

Upon motion the court struck out the answer to the ninth question, left the question unanswered, and ordered judgment for the plaintiff upon the verdict, from which judgment the defendant appeals.

*R. A. Hollister,* corporation counsel, and *H. I. Weed,* of counsel, for the appellant.

For the respondent there was a brief by *Hume & Oellerich,* attorneys, and *Thompson, Thompson & Jackson,* of counsel, and oral argument by *J. C. Thompson* and *Carl Jackson.*

Winslow, C. J.    Three serious contentions are made by the appellant in this case: *First,* that no claim was ever filed with the city council as required by law; *second,* that the plaintiff's intestate was guilty of contributory negligence as matter of law; and *third,* that the recovery in no event can exceed $5,000.    These contentions will be taken up in their order.

1. It appears that in 1902 the city of *Oshkosh* adopted

secs. 925—58, 925—59, and 925—60 of the Statutes of 1898 (being a part of the general city charter law) as a part of its special charter. These sections prohibit the bringing of any action in the ordinary manner on any claim of any kind against the city, and require that the claimant must first present his claim or demand to the city council, and, if the claim be disallowed, appeal from the council's action thereon to the circuit court. In no other way can the plaintiff get into court. These provisions are mandatory. Only by compliance with them can the circuit court obtain jurisdiction of the subject matter. *Oshkosh W. W. Co. v. Oshkosh,* 106 Wis. 83, 81 N. W. 1040.

The only claim presented to the council in the present case was a claim by the plaintiff, as special administratrix, for "damages sustained to the estate of George B. Moyer, his legal representatives and heirs." The recovery in the present action is a recovery under secs. 4255 and 4256, Stats., for the benefit of the widow of George B. Moyer on account of the latter's death, and is not a recovery on behalf of the estate of George B. Moyer for injuries, suffering, medical expenses, or loss of time suffered by Moyer himself. In a case where there is any substantial period of suffering between the injury and the death, both causes of action may co-exist and be joined in the same complaint (*Nemecek v. Filer & S. Co.* 126 Wis. 71, 105 N. W. 225); but where the death is instantaneous, or practically so, there is no cause of action in favor of the estate as a beneficiary. *Johnson v. Eau Claire,* 149 Wis. 194, 135 N. W. 481.

In the present case not only the claim which was filed but the formal complaint in the action and the evidence showed that the death of Moyer was to all intents and purposes instantaneous. The claim states that he was precipitated into the river and was "then and there drowned." By the evidence it appears that he was not seen even to rise to the surface of the water after his fall.

The defendant's contention in brief is that the claim presented to the council is plainly a claim for damages accruing to the estate and not a claim for damages accruing to the widow under secs. 4255 and 4256, hence that there could be no recovery for the benefit of the widow because of the lack of any claim on her behalf, and no recovery for the benefit of the estate because of the practically instantaneous nature of the death.

It must be at once admitted that the claim is not happily worded. At the outset it states that the special administratrix demands of the city $10,000 for "damages sustained to the estate of George B. Moyer, his legal representatives and heirs." It then proceeds to state the facts on which the claim is based, from which it appears that death was practically instantaneous, and hence that there could be no claim in favor of the estate, and closes with the statement, "and said estate and the legal representatives thereof claim the sum of ten thousand dollars damages." The ambiguity and inaccuracy of the statement are quite apparent. It is plain that there is no claim here, technically speaking, in favor of the estate nor in favor of the heirs, and it also seems plain that the words "legal representatives" are not used with legal accuracy. These words when used in their strictly technical sense mean executors or administrators. In the present case there is, in this strictly technical sense, but one legal representative, and yet the claim is for damages suffered by the "legal representatives."

The books are full of cases where these words have been given other and broader meanings. The rule seems to be that they will ordinarily be given their accurate primary meaning where nothing appears to indicate a different intention; but that this rule will readily yield, and where it appears from a survey of the context, the subject matter, and the purpose of the writing that the words were used as indicating heirs, next of kin, descendants, widow, and sometimes even assignees,

grantees, or successors in interest, the intention will be carried into effect and the words given the meaning so intended. *Griswold v. Sawyer,* 125 N. Y. 411, 26 N. E. 464; 25 Cyc. 175–178; 5 Words & Phrases, 4070–4079.

So the word "heir" means, primarily and technically, one who by reason of birth in lawful wedlock inherits real property, but the meaning of the word when used in a paper writing is always a question of intention. It is frequently used to include all the distributees of the personal estate of a deceased person and sometimes the widow of such person. 21 Cyc. 418–422; *Addison v. New England C. T. Asso.* 144 Mass. 591, 12 N. E. 407; *Hanson v. Minn. S. R. Asso.* 59 Minn. 123, 60 N. W. 1091; 4 Words & Phrases, 3241–3264. It seems very clear to our minds that, in preparing the claim before us, the scrivener did not use the words "estate," "heirs," or "personal representatives" with intent to ascribe to them their primary or technical meanings, but rather with the idea of using words which should be broad enough in their signification to include any and all persons who might have legal claims against the city on account of the death of the intestate.

A claim in favor of the widow as beneficiary under secs. 4255 and 4256, as well as a claim in favor of the estate under sec. 1339, must be prosecuted by the administratrix or personal representative, and certainly the administratrix would in both cases be competent to file the claim with the city council. It might perhaps be truthfully said that, in legal contemplation, the administratrix has been damaged to the extent of the widow's damages, because the administratrix recovers such damages as trustee for the widow. We prefer, however, to place the decision upon broader grounds.

No narrow rule of construction should be applied to the wording of the claim. A construction which preserves a *bona fide* claim so that it may be passed upon by a competent tribunal is to be preferred to a construction which cuts it off

without trial. This court has said that "no great amount of formality is required in reference to the form in which claims are presented to a municipal corporation." *Hanrahan v. Janesville,* 137 Wis. 1, 118 N. W. 194. In the same case it was said that a mere ambiguity as to the ownership of a claim filed should not be regarded as jurisdictional, and that the council in such case "might very properly refuse to act upon the claim until it was made definite and certain, or it might disallow the claim because it was indefinite or uncertain as to ownership. Such action would enable the owner to amend his claim." *Ibid.* 6.

The claim is, in effect, the initial pleading in the cause. It is not expected to be technical or lengthy. The reason of the statutory rule with reference to pleadings, namely, that they are to be liberally construed with a view to substantial justice between the parties (sec. 2668), seems to apply to a claim of this kind fully as much as to a formal pleading. We conclude that, while the claim was ambiguously worded, it was apparent on its face that the words "personal representatives and heirs" were not used in a technical sense, but in a popular sense, and should fairly be construed as including the widow, and hence that the claim for damages in favor of the widow was in fact made as required by the statute.

2. The claim that contributory negligence appeared as matter of law is the most serious contention in the case. Upon this proposition the appellant relies confidently upon the case of *Stephani v. Manitowoc,* 101 Wis. 59, 76 N. W. 1110, where under somewhat similar circumstances this court held that the plaintiff's intestate, who walked into the open draw of a swing bridge, was guilty of contributory negligence as matter of law. In that case the deceased, who was a woman in good health, forty-three years of age and well acquainted with the bridge, walked into the open draw on a dark and cloudy, but not a stormy, night, while a steam barge was passing through. There was an approach or viaduct on each side, the north ap-

proach being 120 feet in length and the south approach nearly 100 feet in length, and the swing portion of the bridge 162 feet in length. There were electric lights on each side just above the sidewalk at the beginning of the approach, and there was a lamp placed upon the middle of the swinging portion of the bridge eight feet above the floor, which cast a red light toward each approach when the bridge was open. These lights were all burning at the time of the accident. Neither the bridge nor the approaches had any superstructure above the roadway save a four-foot railing at the side and a similar railing separating the roadway from the sidewalk. The deceased in that case was a foot passenger well acquainted with the character of the bridge and the approach, and it was held that it appeared incontrovertibly that had she looked she could have seen the open draw, and hence that she was guilty of contributory negligence as matter of law. In effect the decision was that a foot passenger who enters on the approach of a swing bridge which he knows to be without guards and also knows may be open, is bound to look and listen before attempting to step in the draw, and is guilty of contributory negligence if he does not do so, and for that reason steps into the open draw.

We have no disposition to find fault with that decision, nor have we any disposition to extend its application. The present case has a number of marked differences which must in reason differentiate it from the *Stephani Case.*

The bridge in the present case is somewhat longer than in the *Stephani Case.* The draw in the present case is 185 feet in length and the approaches about 127 feet each, but these differences are not significant. The approaches in the present case had a greater number of lights than in the *Stephani Case.* There were six so-called cluster electric lights on each approach, each cluster consisting of three sixteen-candle-power incandescent lights about eighteen feet above the roadway but at the side thereof and in the superstructure of the

spans directly underneath the top main truss or chord of the superstructure. There were two of these clusters on the south span twenty-six feet south of the draw, two clusters thirty-two and one-half feet further south, and two clusters thirty-one and one-half feet still further south. In these clusters about fifteen lamps were burning at the time of the accident. There were like clusters on the north approach. There was considerable testimony, however, that these cluster lights, on account of the network of iron girders and braces running across the roadway connecting the tops of the trusses on each side, gave very unsatisfactory light, and that it was difficult in a dark night to see whether the draw was open until one approached to a place within ten or twelve feet of the draw. There was no light of any nature on the draw of the bridge when it was open in the ordinary line of vision as one approached the draw on the roadway of the south approach. There was a red light on top of the cupola or bridge house in the center of the draw more than thirty feet above the roadway; also a red light on the center pier of the draw about five feet above the water and more than six feet below the roadway of the approach; also two red lights, one on each end of the protection pier over which the draw of the bridge rests when it is open. These lights were called marine signal lights and were for the purpose of giving warning to vessels rather than to passengers over the bridge. There was no red light or warning light of any kind directly in the line of vision when the draw was open, as in the *Stephani Case.* In order to see any of the so-called marine signal lights, the passenger on the approach would be obliged to look considerably outside of his ordinary line of vision as he approached the draw.

There were no gates upon the present bridge, but it seems that prior to 1908 there were electric bells upon the old bridge (which stood where the present bridge now stands) which rang continuously when the bridge was open, and that similar bells are in use on the other bridges of the city; that after

the present bridge was built (the precise time not appearing, but probably in April, 1908) a construction company placed a new system of bells upon the bridge with the consent of the city, and it was agreed that the company should keep them in working order for a time, and if they worked successfully the city would pay for them; that these bells had not worked continuously, but that the construction company had from time to time repaired them and attempted to make them work, but that they worked intermittently and for that reason had not been accepted by the city; that they rang the last time in the afternoon of the day of the accident, but did not ring at the time of the accident. The deceased in the present case was riding a bicycle at the time of the accident, instead of walking, as in the *Stephani Case.* There is much testimony from several witnesses that it was snowing, sleeting, and raining at the time of the accident, and that the wind was high. One witness, whose credibility seems not to be impeached, says that you could hardly see your hand before you. There was no such evidence in the *Stephani Case.*

The essential differences between the two cases may be recapitulated as follows: In the present case the intestate was riding a bicycle, in that case the deceased was a pedestrian. In this case there was no danger signal in the usual and ordinary line of vision, in that case there was such signal. In this case there was to the knowledge of the deceased a system of gongs which were supposed to ring, and frequently, at least, did ring while the bridge was open, in that case there never had been any such arrangement. In this case there is sufficient testimony to support the jury's conclusion that the situation was such that an ordinarily careful traveler approaching the draw might not see that it was open in time to save himself, in that case the court was convinced that there was no evidence to support such finding. Upon this last proposition it is argued by appellant that because several truthful witnesses who were approaching the bridge on foot, some of them

at a distance of 150 feet or more, testified that they saw the draw open, the court must reject the jury's finding on this point. We cannot agree with this contention, however. It is important to observe that nearly all of these witnesses had heard the preliminary bell rung before the bridge opened and hence were looking to ascertain the fact, while it is undisputed that the deceased was in his office at the time the bell rang. It can hardly be said that because foot passengers who, having been warned of the contemplated opening of the draw, saw it open when they were carefully looking for it, the deceased, riding on a bicycle and unconscious of any warning, must be held as matter of law to have been guilty of negligence in not seeing the open draw, especially under the evidence with regard to the conditions of the weather at the time.

These differences are all entitled to weight. The man who is driving a team or operating a motor vehicle or a bicycle is in a different situation from the man who is walking. He has other responsibilities and cares than merely to put one foot before the other, and he cannot under ordinary circumstances stop instantaneously as the pedestrian can. Some personal experience with the bicycle enables the writer to affirm rather positively that when riding in the dark the eye must be quite carefully directed to the roadway ahead, that it cannot be safely allowed to wander from side to side; and further, that a certain degree of motion must be kept up, and an instant stop cannot under ordinary circumstances be successfully made. It certainly cannot be said that it is negligence *per se* to ride a bicycle at night over a drawbridge, any more than it can be said to be negligence *per se* to drive a motor vehicle at night over the same bridge. Both means of locomotion are lawful and usual, and in both cases the management of the vehicle demands some attention, while a foot passenger may devote his entire attention to the outlook ahead and can arrest his steps at a moment's warning. *Heath v.*

*Stewart,* 90 Wis. 418, 63 N. W. 1051; *Schliesleder v. Milwaukee E. R. & L. Co.* 147 Wis. 668, 134 N. W. 144.

Again, the presence of an electric bell system on this bridge and on the other city bridges is a circumstance possessing considerable significance when considering the quality of the conduct of the deceased at the time of the accident. Nothing much more misleading than a system of this kind which at intervals does not operate can well be imagined. It is admitted that the deceased crossed this bridge daily, but there is no evidence that he knew of the delinquencies of the electric bell system. If he did not (and we cannot presume that he did), then the fact that it was not ringing at the time of the accident has weight in determining whether the deceased was exercising ordinary care. One who, from past experience, has good reason to believe that a continuous alarm is sounded at every bridge while it is open, may well be excused for approaching a bridge in the darkness with greater confidence than one who knows there is no such alarm. *Rohde v. C. & N. W. R. Co.* 86 Wis. 309, 56 N. W. 872; *Kujawa v. C., M. & St. P. R. Co.* 135 Wis. 562, 116 N. W. 249.

It is true that the trial judge in the present case struck out the answer to the ninth question by which the jury found that Moyer could not have seen before he reached the draw that it was open, if he had looked; but he left undisturbed the seventh finding by which the jury found that the bridge was not lighted sufficiently so as to enable an ordinarily prudent traveler at the time to see that the draw was open before he reached it. We understand this to mean that the trial judge was of opinion that the jury might properly find that the light was so poor that an ordinarily prudent traveler, under the circumstances surrounding the deceased at the time, might approach the draw without seeing that the draw was open until it was too late to save himself, but that he was also of opinion that it could not rightly be said to be a physical im-

possibility for the deceased to see the open draw before he reached it. There is no inconsistency between these two conclusions. We conclude on this branch of the case that the *Stephani Case* does not control the present case, and that there was sufficient evidence to justify the jury in the present case in finding that the deceased was not guilty of contributory negligence.

3. The recovery in the present action was $7,000, and it is claimed that no greater recovery than $5,000 can legally be had in such an action, because in actions brought to recover damages for injuries resulting from defective highways under sec. 1339, Stats., the recovery is limited to $5,000.

The difficulty with this position is that the present action is not an action brought under sec. 1339, but is an action brought for a death caused by the negligence of another under secs. 4255 and 4256. Sec. 1339 is of no materiality here save that it imposes on towns and cities the duty to keep highways in repair and hence makes it negligence to neglect that duty. When, therefore, death results proximately from the neglect of a highway, a cause of action arises against the corporation guilty of the neglect and in favor of the relatives named by the statute by virtue of the provisions of secs. 4255 and 4256. This cause of action, however, is not a cause of action given by sec. 1339, but by secs. 4255 and 4256. Under the two latter sections there may be a recovery of $10,000, and hence the recovery in the present case is clearly within the statutory limit.

The limit of recovery in this latter class of actions was changed from $5,000 to $10,000 by ch. 581, Laws of 1907, by which sec. 4256 was entirely rewritten. It is argued that this amendment may be limited to actions against railway companies alone from the fact that the act is entitled "An act to amend section 4256 of the statutes relating to the liability of railway companies for the death of any person." It is evident that the title is erroneous and misleading, but as the

law is a general, not a private or local, law, this has no effect on its validity. There are no ambiguities in the wording of the law; it is perfectly plain in terms and applies to the recovery in any case of death by actionable negligence, hence the wording of the title can have no effect.

*By the Court.*—Judgment affirmed.

VINJE, J. (*dissenting*). · I have reached the conclusion that the evidence does not support negative answers to questions 7 and 9. Otherwise I concur with the opinion of the court.·