WITKOWSKI, Special Administratrix, Respondent, vs. CITY OF MENASHA, Appellant.*

*December 10, 1942—January 12, 1943.*

---

* Motion for rehearing denied, without costs, on March 9, 1943.

*Edward C. McKenzie* of Menasha, for the appellant.

For the respondent there was a brief by *Sigman & Sigman* of Appleton, and oral argument by *Abraham Sigman*.

MARTIN, J.   On October 6, 1940, at about 2:50 a. m., Mr. and Mrs. Witkowski were returning to their home from attending a party at a relative's home.   It was necessary to cross the Mill street bridge to get to their home on Winnebago avenue.   They proceeded along Water street in their 1935 Ford sedan to the intersection of Water and Mill streets.   Mr. Witkowski, who was driving, brought his car to a stop directly opposite the stop sign located at the northeast corner of the intersection.

Mill street runs in a northerly and southerly direction; Water street, in an easterly and westerly direction.   Defend-

ant city owned and maintained a swing bridge, known as "Mill street bridge," spanning the north and south banks of the canal in the Fox river. The north end of the swing bridge extends approximately to the south line of Water street. The night was dark and a heavy rain was falling. Automobile traffic going from East Water street, intending to turn left onto the bridge, must make a turn at an angle of 73.45 degrees. Such was the direction deceased was traveling on the night in question. At the time the bridge structure was an iron-gray color. There were no lights on the bridge except a red and green marine light located on the northeast corner of the swing span. When the span opens it pivots in the center. The northeasterly point of the swing span, on which the marine light was located, turns west when the swing span is open.

The bridge tender testified that before opening the swing span of the bridge he placed a stop sign in the roadway in front of the entrance to the bridge. This stop sign is seven inches by eighteen inches, on an iron pipe thirty-four inches from the ground, bearing the word "stop." The word "stop" is spelled out in letters five inches high, four inches wide, painted yellow on a black background, and is studded with red reflectors. Forty of those studs make up the word "stop." A chain with one-fourth-inch links was placed across the opening of the bridge approach. This chain was old and rusted. The roadway of the bridge is fifteen feet wide. The bridge tender testified that he placed a red lantern in the street about two and one-half feet from the edge of the opening at the north end. The bottom of the glass in the lantern is three inches from the bottom of the lantern. The lantern is four and one-half inches high.

After the deceased had stopped his car on the east side of the intersection of Water and Mill streets, he proceeded to shift gears, made the swing to his left to approach the bridge. The span being open, his car went off of the approach and

into the canal, where he was drowned. His wife was rescued.

The plaintiff's case is grounded on alleged negligence of defendant city in maintaining a swing bridge across the canal without providing on said bridge and bridge premises, particularly at the north end of said bridge at the junction of Water and Mill streets, proper, adequate barriers, lights, bells, or other warning signals or devices so as to make said bridge reasonably safe and sufficient for the safe passage of travelers both by day and at night, to protect travelers from falling into the canal when the bridge was open. The stop sign, chain, and lantern, to which reference has been made, were the only devices provided as means of a warning to traffic when the swing bridge was open. The stop sign, as placed by the bridge tender, was intended as a warning to the traveling public as they might approach from three directions—the east, west, and north. If the bridge tender placed the stop sign in a position so that traffic coming from the west could, by means of the reflector buttons, read the word "stop," the sign would have little, if any, effect as a caution to the Witkowskis who approached the intersection of Water and Mill streets from the east. It seems obvious that the chain extended across the approach to the bridge could not be considered as an adequate warning. The lantern did not light up the roadway or show the chain.

The street superintendent was asked:

"*Q.* In your experience as superintendent of public streets you have observed have you not of lanterns of this type going out in storms, particularly in rain storms? *A.* Once in a while you find one."

Mrs. Witkowski testified:

"As we approached the arterial stop sign I saw the sign. As we approached the [arterial] stop sign on Water street I looked ahead. I did not see any reflector or red flasher stop sign. I looked toward the bridge shortly before we were

precipitated into the canal. At the time I was looking to the front, I saw no sign, no lantern or chain. If there had been a lantern and a sign there I believe I would have seen them. I believe there was nothing there to indicate the bridge was open. In my opinion the car was traveling five to eight miles per hour after starting to make the circle to go onto the bridge."

It appears that the jury viewed the premises at the opening of the trial. In its decision upon the motions after verdict, the trial court stated:

"So far as the contributory negligence of the plaintiff is concerned the jury recognized some and made deductions therefor. With respect to the negligence of the city, there is not only sufficient evidence to sustain the finding of the jury that the city was negligent in failing to provide suitable warning devices, but the failure of the city as disclosed by the evidence is almost shocking."

The appellant contends: (1) That the warning devices provided were sufficient to render the bridge reasonably safe for travelers; (2) that the jury's finding that deceased was guilty of only twenty-five per cent of the total negligence is contrary to the preponderance of the credible evidence; (3) that the court should have submitted defendant's requested instructions relating to the degree of care required of one knowing the place of the accident to be inherently dangerous.

(1) In support of its first contention, appellant relies on the rule applied in *Stephani v. Manitowoc* (1898), 101 Wis. 59, 76 N. W. 1110. That was an action to recover damages for the death by drowning of plaintiff's intestate who fell at night into the open draw of a bridge which was maintained as a part of the street and was frequently opened for the passage of vessels. It appeared in that case that shortly before the plaintiff's intestate had reached the bridge the bridge tender rang the bell, then opened the bridge to permit a steam barge to pass through, and that just as the barge was about to

pass through intestate walked off from the west sidewalk, fell into the river, and was drowned. The night was somewhat dark and cloudy, but it was not storming at the time of the accident. There were two twenty-four-candle-power electric lights near the bridge, one immediately over the east sidewalk on the south approach, ninety-eight feet south of the draw; and one immediately over the west sidewalk on the north approach, one hundred twenty-six feet north of the draw. There was also a kerosene lamp placed upon the middle of the bridge eight feet above the floor, which cast a red light toward the approach on each side of the bridge when the bridge was open. The swing part of the bridge was one hundred sixty-two feet in length. All the lights were lighted at the time of the accident. There were no guards upon the approach of the bridge to prevent people from walking into the river when the bridge was open.

By their special verdict the jury found that the sidewalk across the bridge at the place in question was insufficient and unsafe for travel over the same on foot by persons in the exercise of ordinary care; that absence of a guard or gate at the end of the approach next to the drawbridge, the position and kind of lights on the north and south approaches to the bridge, the danger light on the drawbridge, and the ringing of the bell before turning the draw, made travel over and along the west walk unsafe or dangerous to persons using ordinary care; that the plaintiff's intestate for a considerable time before her death was familiar with the bridge and with the signal lights on the drawbridge but that she did not know what such signal lights meant; that the plaintiff's intestate for a considerable time before her death was familiar with the electric lights on the north and south approaches to the bridge and knew that the draw might be swung open at any time for the passage of vessels; that on the night in question as plaintiff's intestate was approaching the bridge and before she reached the draw she would not have been able to see

that the draw was open if she had looked; that the deceased was not guilty of any want of ordinary care which contributed to produce or cause her death. The trial court rendered judgment for the plaintiff upon the verdict. On appeal the judgment was reversed and action remanded for a new trial. At page 64, Mr. Justice WINSLOW, speaking for the court, said:

"Proceeding now to the merits of the case, we find very few adjudications touching the duties of the corporation maintaining a swing bridge, and fewer yet which discuss the duties of the traveler approaching such a bridge. The principles, however, which must govern the right of both parties cannot be difficult of ascertainment or application. The bridge (although it be a swing bridge) is an essential part of the highway. Moreover, under the terms of sec. 1339, R. S. 1878, if, by reason of any insufficiency therein, a traveler suffers injury without contributory negligence, the city is liable for such injury. · In this very case it has been held, upon demurrer to the complaint, that, if barriers or lights were necessary to protect travelers from falling from the bridge when the draw was open, then the absence of such barriers or lights was an insufficiency or defect in the structure of the bridge. *Stephani v. Manitowoc,* 89 Wis. 467. This is the law of the case so far as the duty of the city is concerned; and, the evidence showing that there were no such barriers, there was ample foundation for the finding of the jury to the effect that the sidewalk across the bridge was insufficient and unsafe for travel."

The court then refers to the undisputed facts to the effect that the Manitowoc river between dock lines is about three hundred eighty feet in width, the south approach being nearly one hundred feet in length and the north approach about one hundred twenty feet in length. The approaches were planked and narrower than the street, having handrails at the side. At the land end of each approach there was hanging over the sidewalk a twenty-four-candle-power electric light. The bridge had no superstructure above the roadway save a railing on each side, four feet in height. There was a red signal light

about eight feet above the floor of the bridge and in the middle between the rails. The plaintiff's intestate had lived in Manitowoc for many years and had crossed and recrossed the bridge both in the daytime and in the evening almost daily for years. She knew it was a swing bridge, that it was frequently open, that there were no guards, and that a person who walked off from the approach would go into the river. The jury found that the plaintiff's intestate could not have seen that the draw was open if she had looked. At page 67 the court said:

"This finding is based only on the fact that it was a dark night, and the testimony of two witnesses, who say that by looking down in front of them they could not tell whether the bridge was open or closed, because it was too dark. The same witnesses, however, admit that if one approaching from the south were to look at the electric light on the north approach of the bridge, he could plainly see the open bridge between himself and the light. This is substantially the testimony of all the witnesses, and it accords with reason. The requirement of ordinary care in approaching the bridge, after being advertised of the danger by the very fact of walking up and over the approach, would not be satisfied by 'looking down in front' upon the sidewalk, but would require looking ahead, if there were lights ahead; and if, as appears beyond dispute in this case, there was a light immediately ahead, which, when looked at, would show that the bridge was open, then the failure to look and observe would be a failure to exercise ordinary care under the circumstances. There is much testimony, also, that the intestate failed to use her ears as well as her eyes. The bridge bell was admittedly rung before the bridge was opened, and the evidence shows that it could be heard several blocks away; the steam barge which was approaching the bridge was making a slow exhaust as it approached the bridge, which made quite a loud noise. . . . All these facts indicate clearly that the intestate neither looked nor listened."

In *Moyer v. Oshkosh* (1913), 151 Wis. 586, 139 N. W. 378, which was an action to recover damages on account of

the plaintiff's intestate, a man forty-five years of age, who, while crossing the Main street bridge in the city of Oshkosh at about 6:30 on the evening of November 15, 1909, riding a bicycle, ran into the Fox river through the open draw and was drowned. The jury found that the lighting system used on the bridge at the time in question and previous thereto rendered the bridge insufficient and unsafe for persons traveling over the same on vehicles in the exercise of ordinary care and prudence; that the absence of guard or gate at the end of the approach next to the drawbridge made travel over and along the roadway of said bridge on vehicles unsafe or dangerous to persons using ordinary care and prudence; that the system of gongs and bells in use at the time and place and for many months previous thereto were so defective and insufficient as to make the bridge as to persons traveling over and along the roadway thereon on vehicles unsafe and dangerous to travelers thereon using ordinary care and prudence; that the defective and insufficient condition of the bridge was the proximate cause of the death of plaintiff's intestate; that deceased was not guilty of any want of ordinary care; that the bridge was not so lighted as to enable a traveler on the roadway approaching the open draw, in the exercise of ordinary care and prudence, to see that the draw was open before he reached the draw; that the cluster lights on the south span of the bridge were burning at the time Moyer fell into the river. Moyer approached the bridge from the south and proceeded in a northerly direction to cross same until he went through the open draw. The court granted judgment for the plaintiff upon the special verdict, and the city appealed. Judgment was affirmed on appeal. In the opinion Mr. Chief Justice WINSLOW differentiates the case from *Stephani v. Manitowoc, supra.* He said, referring to the *Stephani Case* (p. 595):

"We have no disposition to find fault with that decision, nor have we any disposition to extend its application."

As it appears to us, the facts in the case at bar make a stronger case against the city than did the facts in *Moyer v. Oshkosh, supra*. The trial court was of the view that the case is ruled by *Moyer v. Oshkosh*. We are of the same view. In the *Oshkosh Case* the intestate was crossing the bridge riding a bicycle; in the *Manitowoc Case* deceased was a pedestrian. In the *Oshkosh Case* there was no danger signal in the usual and ordinary line of vision; in the *Manitowoc Case* there was such signal. In the *Oshkosh Case* there was, to the knowledge of the deceased, a system of gongs which were supposed to ring, and frequently did ring while the bridge was open; there was no such arrangement in the *Manitowoc Case*. The court said, in *Moyer v. Oshkosh* (p. 597):

"In this case there is sufficient testimony to support the jury's conclusion that the situation was such that an ordinarily careful traveler approaching .the draw might not see that it was open in time to save himself, in that case [referring to the *Manitowoc Case*] the court was convinced that there was no evidence to support such finding."

The man who is driving a team or operating a motor vehicle or a bicycle is in a different situation from the man who is walking. In the *Oshkosh Case, supra,* the plaintiff's intestate traveled a distance of one hundred twenty-five feet over the south approach of the bridge before reaching the open draw. On the south approach to the bridge there were six clusters of lights, each cluster consisting of three sixteen-candle-power incandescent lights, about eighteen feet above the roadway. There were two of these clusters on the south span, twenty-six feet south of the draw; two more clusters thirty-two and one-half feet further south; and two clusters thirty-one and one-half feet still further south. There were like clusters on the north approach to the draw. There were no gates upon the Oshkosh bridge.

The mere statement of the facts shows that the deceased in the *Oshkosh Case, supra,* had better opportunity to observe that the draw was open before running into same than did the deceased in the case at bar. In that case Moyer had traveled a distance of one hundred twenty-five feet on the bridge before reaching the draw. In the case at bar the north end of the open span was approximately even with the south boundary of the intersection of Water and Mill streets. The deceased while shifting gears was also making a turn to his left at an angle of 73.45 degrees. He is entitled to the presumption that he was in the exercise of ordinary care. The jury may have concluded that the lantern light had gone out before the Witkowski car had reached the intersection. There is testimony to the effect that on some former occasions this had happened. It was a dark, stormy, windy night. Some little time had elapsed after the bridge tender had set the lantern before the accident happened. The bridge tender testified that he had received the signal to open the draw when the barge was a block and a half away from the bridge. At no time after he had placed the lantern did the bridge tender testify that he saw the red light burning either while opening or after he had opened the bridge, and before the accident. Mrs. Witkowski, who sat in the front seat of the car with her husband, testified that she was looking forward. She said:

"I saw no sign, no lantern or a chain. If there had been a lantern and a sign there I believe I would have seen them."

Both the *Manitowoc* and *Oshkosh Cases, supra,* were before the adoption of the comparative-negligence law in Wisconsin. That law is, of course, applicable in the instant case. Whether the city of Menasha failed to exercise ordinary care in maintaining its Mill street bridge so as to render it reasonably safe for travelers presented an issue of fact for the jury. There is ample evidence to sustain the finding that the city failed to exercise such care.

(2) Appellant contends that the finding that deceased was guilty of only twenty-five per cent negligence is contrary to the preponderance of the credible evidence. In support of its contention, appellant relies largely on the rule in *Stephani v. Manitowoc, supra.* As pointed out above, the facts in that case are clearly distinguishable from the case at bar. The jury found that plaintiff's intestate was not negligent with respect to control of his car. In *Moyer v. Oshkosh, supra,* the jury found that Moyer could not have seen, before he reached the draw, that it was open, if he had looked. The trial court struck out that answer. The jury in that case also found that the bridge was not lighted sufficiently so as to enable an ordinarily prudent traveler at the time to see that the draw was open before he reached it. The trial court permitted that answer to stand. At page 599 the court said:

"We understand this to mean that the trial judge was of opinion that the jury might properly find that the light was so poor that an ordinarily prudent traveler, under the circumstances surrounding the deceased at the time, might approach the draw without seeing that the draw was open until it was too late to save himself, but that he [the trial court] was also of opinion that it could not rightly be said to be a physical impossibility for the deceased to see the open draw before he reached it. There is no inconsistency between these two conclusions. We conclude on this branch of the case that the *Stephani Case* does not control the present case, and that there was sufficient evidence to justify the jury in the present case in finding that the deceased was not guilty of contributory negligence."

Appellant argues that when Witkowski stopped at the arterial sign, and before entering the intersection, it was his duty to look both ways for approaching traffic and for the possibility of the bridge being open. There is no evidence that he did not look as he approached and entered the intersection. The presumption is that he did, in the absence of any evidence to the contrary. *Smith v. Green Bay,* 223 Wis. 427, 429, 271 N. W. 28; *Guderyon v. Wisconsin Telephone Co.* 240

Wis. 215, 226, 2 N. W. (2d) 242. The latter case involved the question of deceased's negligence as to lookout. The court said:

"In relation to Mrs. Guderyon's conduct as she approached and collided with the truck, the defendants contend that under the facts and circumstances established by the evidence she was causally negligent in respect to lookout, control and management, and speed as a matter of law. This contention cannot be sustained in so far as it is in relation to her lookout. There is no evidence as to whether she did or did not maintain a sufficient lookout, or as to what she observed or did not observe but ought to have observed in the exercise of ordinary care as she was approaching the cloud of smoke and place of the accident. *Because of her death she did not testify on the trial and in the absence of any evidence whatsoever in relation to her lookout there is applicable the presumption that she was exercising due care for her own safety; and until there is some proof from which it can be inferred that she did fail negligently to keep a proper lookout, there can be no finding that she was negligent in that respect.*"

After a careful consideration of the evidence in the case at bar, we conclude that there is no proof from which it can be inferred that the deceased failed negligently to keep a proper lookout, hence there can be no finding that he was negligent in that respect. However, the jury so found; and the respondent made no motion in the trial court to change the jury's answer to subdivision (a) of Question No. 3 from "Yes" to "No," and respondent has filed no motion to review in this court under sec. 274.12, Stats. In *Millard v. North River Ins. Co.* 201 Wis. 69, 75, 228 N. W. 746, with reference to the absence of a motion to review, the court said:

"However, in the absence of the service by plaintiffs of a notice under sec. 274.12, Stats., stating in what respect they ask for a review or modification of the circuit court's judgment, they are not entitled to any such review or modification in this court at this time." To same effect see *Noll v. Nugent,* 214 Wis. 204, 252 N. W. 574; *Kaczmarski v. F. Rosenberg Elevator Co.* 216 Wis. 553, 257 N. W. 598; *Hayes v. Roffers,*

217 Wis. 252, 258 N. W. 785; *Geier v. Scandrett,* 236 Wis., 444, 449, 295 N. W. 704.

(3) Appellant contends that the court erred in refusing its requested instructions in reference to Question No. 3, subdivision (a), with respect to lookout. The phraseology of the requested instructions was highly argumentative. In any event, the court fully instructed on the law applicable to that issue.

It follows that the judgment as entered below must be affirmed.

*By the Court.*—Judgment affirmed.

BARLOW, J., took no part.

* Motion for rehearing denied, without costs, on May 18, 1943.